## LITTLE v. STRINGFELLOW.

No. 2761.   Decided August 4, 1915.   (151 Pac. 347.)

1. APPEAL AND ERROR—FINDINGS—SUPPORT IN EVIDENCE—REVIEW. All parties are entitled to invoke the Supreme Court's judgment on the facts in equity cases, and where the findings of fact are clearly against the evidence, or the court is satisfied that the presumption of their correctness has been overcome by the record, it must make or direct findings according to the evidence and the law applicable thereto.[1]   (Page 583.)

2. LOST INSTRUMENTS—DEEDS—RESTORATION—SUFFICIENCY OF EVIDENCE. Evidence in an action to restore a lost deed brought against the administrator of one of the alleged grantors, notwithstanding the trial court's findings that the deed was made, acknowledged, and destroyed, *held* to require a decree restoring the deed.   (Page 584.)

Appeal from District Court, Third District; *Hon. T. D. Lewis*, Judge.

Action in equity by Alice S. Little against Joseph W. Stringfellow, as administrator of Fannie Maria Little Stringfellow, deceased.

Judgment for defendant, dismissing complaint. Plaintiff appeals.

[1] *Campbell* v. *Gowans*, 35 Utah 268; 100 Pac. 397; 23 L. R. A. (N. S.) 414; 19 Ann. Cas. 660; *Utah Commercial & Savings Bank* v. *Fox*, 44 Utah 323; 140 Pac. 660.

REVERSED and remanded, with directions.

*Gustin, Gillette & Brayton* and *Weber & Olson,* for appellant.

*Young, Snow, Ashton & Young,* for respondent.

FRICK, J.

The plaintiff commenced this action in the District Court of Salt Lake County, in equity, against the defendant as administrator of the estate of one Fannie Maria Little Stringfellow. The purpose of the action was to restore a lost deed, which, it is alleged, the deceased, during her lifetime, had executed and delivered to the plaintiff and in which certain property which was specifically described was conveyed to her. The defendant, after admitting all the matters of inducement contained in the complaint, denied the execution and delivery of the deed referred to in the complaint.

The deceased was the wife of the defendant and the sister of the two other grantors in the deed in question. During her lifetime, she was the owner of a one-fifth interest in the property in question, and her two sisters and two younger brothers were the owners of the other four-fifths. She died at Salt Lake City, in January, 1913, and the defendant was appointed administrator of her estate. The plaintiff was the mother of the deceased, and lived on the premises in question, which, it appears, constituted the family home; that is, the home of the mother, the two sisters, and the two brothers. The deceased lived with her husband, the defendant, some little distance from the property in question.

At the trial the plaintiff in substance produced the following evidence:

A. J. Weber, a member of the Salt Lake bar, testified that on the 30th day of December, 1911, the deceased and her two sisters came to his office by appointment to sign and acknowledge the deed in question, and that he read the deed; that the property in question was therein described, and three-fifths thereof was thereby conveyed to the plaintiff by the three grantors, namely, the deceased, Romania, and Clara

Little; that the grantors acknowledged the deed before him, and, after attaching his notarial seal thereto, he thinks the deceased took it, and the three sisters left his office which was in the Boston Building on Main street, in Salt Lake City.

Mr. Weber's stenographer, Miss Ethel Davis, testified that the three sisters came to Mr. Weber's office at the time stated by him, through an appointment she made for them.

Mr. Sallee, the principal of the high school of Filer, Idaho, and a friend of the Littles, testified that he knew the deceased in her lifetime, and he was acquainted with the other two sisters and their mother, the plaintiff; that he was in Salt Lake City, from September, 1912, to about June, 1913; that at a certain time during the fall of 1912, when he was at the home of the plaintiff, and the deceased was there also, she told the witness that they; that is, "we three girls, had given or deeded the property, this home," to the mother. This witness testified that the deceased made statements to that effect to him several times, and especially on Thanksgiving night, 1912, when he and she were again at plaintiff's home.

Mrs. May Dowse, who was an intimate friend of the deceased, and whose home it seems was close by where the deceased lived, testified that she very often visited the deceased; that she called on her on New Year's morning, 1912; that on that morning the deceased told the witness that she and her two sisters had made a deed to the home property and exhibited the deed to the witness; that the deceased said that she and her two sisters wanted to make a New Year's present of the home to their mother; that the witness examined the deed, and it was signed by the deceased and her two sisters Romania and Clara Little; that Mr. Weber's name was also signed to the deed and it had his notarial seal attached thereto; that the deceased said that her brother would call for the deed that morning; that the brother came while the witness was at the home of the deceased, and the deceased, in the presence of the witness, gave her brother the deed in question. Mrs. Dowse further testified that on the following day, the deceased told her that the "children" had given the deed to the mother on the preceding day and that she thereafter told the witness that she was glad that the mother had the prop-

erty.   The witness also referred to other instances when the deceased spoke about the matter; expressed herself as pleased that she and the girls had deeded the property to the mother, and that she wanted the two brothers to do the same when they arrived at the age of majority.

Mr. J. J. Meyers, hotel inspector for the State of Utah, testified that he was a friend of the Littles; that on New Year's day, 1912, he was at the Little home making a New Year's call between the hours of three and five o'clock in the afternoon; that he and Prof. Madden, a teacher, Romania and Clara Little, and the plaintiff were present, that a written instrument was handed him and he partially opened it; that, while he did not read the whole instrument, he saw that it was signed by the deceased, by Romania, and by Clara Little; that a few days later he was invited to a dinner at the deceased's home, and while there the question about the home was again brought up.   He further testified:

"And I made the remark to Mrs. Stringfellow (the deceased) that I thought it was a nice thing of the children to give the mother the property, and she said, 'Yes, and I am glad she has got it.' "

Mrs. Mabel E. Rothwell, another witness for plaintiff, testified that she knew the deceased in her lifetime; that in October, 1912, the witness called at the home of plaintiff; that she met the deceased there, and, in a conversation about the expense of keeping up a home, the deceased said to her:

" 'Yes, you know we girls deed the home to mamma.' (Quoting from bill of exceptions.)   And I said, 'No, I didn't know it,' and she said, 'We have,' and I said, 'That is very nice of you,' and she said, 'Yes, we always want mamma to have a home.' "

Romania Little, one of the grantors, testified very fully with regard to the execution and delivery of the deed.   She, among other things, said:   That the deceased, herself, and her Sister Clara, met at Mr. Weber's office on the evening of December 30, 1911, to sign and acknowledge the deed in question.   That they had telephone Mr. Weber, and the deceased had the unsigned deed with her.   That the deceased said to Mr. Weber:

"Mr. Weber, we want you to read this over and see that everything is all right, see that Joe (the defendant) made it all right, and we want you to be the notary public."

That they all three signed the deed there, and Mr. Weber took their acknowledgement, and the deceased then took the deed. That the next time she saw it was on New Year's morning, January 1, 1912. That her brother went to the home of the deceased on New Year's morning and returned with the deed and a note or letter from the deceased and a bunch of violets. That the witness, Clara, and her two brothers then went upstairs to the mother's room, and the brother then read the note or letter to the mother, after which he gave the deed, the note, and the violets to her. The witness then testified where the deed was kept by the mother, that it was not recorded, and that it was missed some time early in January, 1913. Although the witness testified at great length, it is not deemed necessary to further set forth her testimony in detail.

The older brother also testified that on New Year's morning he went to the deceased's home by appointment, for the deed; that he then saw the deceased and Mrs. Dowse, the witness we have before referred to; that the deceased gave him the deed and the note or letter she had written to her mother and a bunch of violets; that he took them all home and delivered all of them to the mother in the presence of his two sisters, and his brother younger than he. This witness further said that the deceased had frequently spoken to him about the mother and had told him that she thought that when he became of age it was his duty to deed his interest in the property to the mother. The older brother was about seventeen years of age, and the younger one about fourteen at the time.

Clara Little's testimony was practically the same as Romania's in regard to the signing and delivery of the deed, and the younger brother also testified to the delivery the same as his brother and sisters.

Mrs. Jane Kimball, a lifelong friend of the deceased, testified that shortly after New Year's, 1912, in a conversation with the deceased, the latter told the witness that they, the three girls, had given a deed to the mother; that she said that

she had delivered "the deed to her home, the girls had signed it, and the home is mamma's." The witness further testified that up to within a month of her death the deceased had often spoken about her mother, and that the deceased was glad that the home was deeded to the mother.

The plaintiff testified that she had received the deed and told where she had kept it; that it was not recorded, and that she missed it early in January, 1913; that she had made diligent search, but could not find it anywhere.

It was also shown that during the last sickness of the deceased the defendant sometimes slept in the room where the deed was kept. All the sisters and brothers further testified that the deed, after its delivery, in the presence of the plaintiff, was shown to the defendant, and that plaintiff asked the defendant why he did not sign it, and that he said he did not own the property and did not give it, and did not have to sign; that "I have done my part in having it made up."

The defendant testified in his own behalf. He said that the latter part of May, or fore part of June, 1912, he prepared a quitclaim deed, whereby the property in question was to be conveyed to the plaintiff; that he prepared it at the request of the deceased, and it was to be signed by her, Romania, and Clara Little; that the deed was in his own handwriting on a printed form; and that the same was on the following day signed and acknowledged by the three sisters before Mr. Weber. The witness testified that the deed was prepared for the reason that Romania was at that time being courted by a certain schoolteacher who was in some trouble, and for that reason the deceased wanted Romania's interest in the property protected. He also said that he frequently saw the deed thereafter at his home until some time in October. The witness also, so far as he knew the facts, denied various statements testified to by the plaintiff's witnesses as well as the statements attributed to him.

Miss Grace Stringfellow, a sister of the defendant, also testified in his behalf. The substance of her testimony is to the effect that in the fall of 1912 the defendant was away from home much of the time; that during his absence the deceased "stayed at her mother's home part of the time, at

our home part of the time, and her sister stayed at her own home with her part of the time, and I stayed with her part of the time''; that during the time the witness stayed with the deceased they did some sewing on the deceased's sewing machine; that the witness, in looking for a pair of scissors, discovered the ''deed'' in the upper machine drawer; that she did not read the deed, nor did she critically examine it, but she saw the names of the deceased, of Romania, and of Clara Little on what she called the top of the deed; that it was written on a blank form, and the blanks were filled in in the handwriting of the defendant; that she did not see any signatures to the deed and did not know whether it was signed, nor did she notice any notarial seal attached thereto. In answer to the question, ''Did you observe whether it purported to be a deed from the girls to Mrs. Little?'' she answered, ''Yes, it was a deed from the girls to Mrs. Little for the home.'' She also says that she then called the deceased's attention to the deed, and that (referring to the deceased) ''she took it this way and just ripped it up, and said: 'This is no good; we are going to buy mamma another little home.' '' The witness further said that after the deceased had torn up the deed the witness gathered up the pieces and took them ''downstairs and put them with my own hand in the stove.''

E. W. Stringfellow, a brother of the defendant, also testified that ''along about August, 1912, he saw a deed at the home of the defendant in the dining room.'' He, however, did not examine it, nor did he know what became of it, nor did he in fact know that it was an executed deed.

Ada Stringfellow, a sister-in-law of the defendant, testified that, as well as she could remember the time, ''it was in the spring or early summer,'' perhaps June, 1912, when she met the deceased, Romania, and Clara Little in front of the Boston Building in Salt Lake City; that they spoke to her and said that they had been up (in the building) to see about having a deed signed for their mamma; that she observed that the deceased held a paper in her hand ''indicating'' a deed, and she said, ''We have been up having a deed signed for mamma.''

Mr. Weber was also called as a witness by the defendant

who testified that he well recollected the incident of acknowl-
edging the deed in question; that he acknowledged only one
deed for the three sisters for their interest in the home, which
was the deed he had previously testified about.

The District Court made the following findings of fact:

"That the said Fannie M. Little Stringfellow did not, on
December 31, 1911, or at any other time, convey a transfer
by any good or sufficient deed her interest in or to the prop-
erty hereinbefore described, and that the said Fannie M.
Little Stringfellow did not convey to the plaintiff herein her
interest in or to said property or any part thereof; that the
said Fannie M. Little Stringfellow did not on or about the first
day of January, 1912, or at any other time, deliver to the
plaintiff any deed to the said described lands; that the plain-
tiff herein did not at any time lose any deed to the said
described premises which has been executed by the said Fannie
M. Little Stringfellow."

The court then proceeds to find that the deed was made,
acknowledged, and destroyed as claimed by the defendant and
his sister. Upon such findings, the court made conclusions
of law and entered judgment dismissing plaintiff's complaint.
The plaintiff appeals. Her counsel, in their brief, state the
matter presented for review thus:

"This appeal being taken wholly on questions of fact and
sufficiency of the evidence to warrant the findings of the court,
it is not necessary," etc.

We have carefully read all the evidence which is preserved
in the bill of exceptions, and we have attempted to reflect the
controlling portions thereof as fully as it is possible to do that
within the limits of an ordinary opinion. Counsel for the
appellant insist that, in view that this is an equity case,
she is entitled to our judgment upon the facts, and that
it is our duty to determine whether the findings are
supported by the evidence or whether they are clearly against
the weight thereof. It is well settled in this jurisdiction that
all parties are entitled to invoke our judgment upon the facts
in equity cases within the limits stated in *Campbell* v. *Gowans*,
35 Utah, 268, 100 Pac. 397, 23 L. R. A. (N. S.) 414, 19 Ann.
Cas. 660, and *Utah Commercial & Savings Bank* v. *Fox,* 44

Utah, 323, 140 Pac. 660. We need not again state the rule laid down in those cases. It is sufficient to say that a mere cursory analysis of the evidence in this case shows that it comes squarely within the rule laid down in those and other cases there referred to.

In our judgment, the findings of the district court are not only against the great weight of the evidence, but they are against the inherent probabilities which naturally arise therefrom. Mr. Weber, Miss Davis, his stenographer, Mrs. Dowse, Mr. Meyers, Miss Romania, and Miss Clara Little, the two brothers, and the plaintiff, must all be branded as willful and corrupt perjurers if the findings as made are true. Each one of those witnesses gave some good reason why they knew the deed in question was executed and delivered at the time stated by them. True, they did not all testify to the delivery; but they all testified to its execution, and five of them testified directly to its delivery, and the statements of the other witnesses, if true, show that the deed must have been delivered as claimed by the five witnesses just referred to. The statements of the other witnesses to which reference is made are those concerning the declarations of the deceased that the property in question had been deeded to the plaintiff. In this connection it must be remembered that the deceased did not make but one declaration, at but one time, to only one person; but that the declarations testified to were repeatedly made at different times and to different persons under different circumstances, and were of such a character that the witnesses hearing them could not well have mistaken their tenor or effect. The declarations of the deceased therefore were entitled to much more weight than is the case where a mere casual declaration is testified to by one or even several witnesses which was heard only once.

It is contended that the children of plaintiff were biased in their mother's favor, as a matter of course, and that the other witnesses were her friends, and thus were influenced by their friendship. It is no doubt true that friendship in many instances may and does tend to influence a witness so that he may color his statements most favorable to his friend. Mere friendship will, however, not invent facts and commit willful

perjury to sustain a cause. Why should Mr. Weber, Mrs. Dowse, Mr. Meyers, and Mrs. Kimball commit perjury? So far as the record shows, they could gain absolutely nothing by pursuing such a course. If therefore it were assumed that the two sisters, the two brothers, and the plaintiff, because of their interest, were tempted to falsify, yet their statements were directly corroborated by Mr. Weber, Miss Davis, Mrs. Dowse, and Mr. Meyers, and indirectly by the statements of Mrs. Rothwell, Mrs. Kimball, and Mr. Sallee. This is so far the reason that, if the deed had not been executed and delivered as stated by the two sisters, the two brothers, and their mother, the declarations attributed to the deceased by Mrs. Rothwell, Mrs. Kimball, and Mr. Sallee could not have been made by her, and hence could not be true. It should be remembered, in this connection, that Mrs. Kimball, a lifelong friend of the deceased, testified that within a month of her death the deceased expressed herself as being pleased that the property had been deeded to the mother. If the deed had been destroyed in October, 1912, as contended for by the defendant, the deceased could not have made the statements to the contrary after that date as testified to by Mrs. Kimball.

It is suggested, however, that, if the deed in question was executed and delivered as testified to by plaintiff's witnesses, then the defendant and his witnesses must have committed perjury. This conclusion does not necessarily follow. So far as Miss Grace Stringfellow's statements are concerned, all that she said may in substance be true, yet it in no way affects the truthfulness of plaintiff's witnesses. Miss Stringfellow may have seen a paper destroyed which she concluded or assumed was a deed. It is significant that she saw no signatures to the instrument that she said was destroyed and noticed no notarial seal attached thereto. What Miss Stringfellow described, therefore, was not an executed deed, but she merely concluded or assumed that the paper she saw was a deed. Then, again, it was an easy matter for her to have been mistaken regarding the import of the deceased's declaration made at the time. That she was mistaken in that regard is made clear from the fact that the deceased repeated her former declarations to Mrs. Kimball that the property had been deeded

to the plaintiff, which declarations were made after the event testified to by Miss Stringfellow occurred, all of which could not have been made if the paper testified to by her was the deed in question.   This disposes of Miss Stringfellow's testimony.   Now as to the defendant's statements:  The defendant at the time was a practicing attorney.   It was therefore not only possible, but was quite within the range of probabilities, that he may have been mistaken with respect to the time he prepared the deed he referred to.   He may also have been mistaken with regard to the fact that he prepared but one instrument.   It requires neither argument nor illustrations to convince any experienced lawyer how easily mistakes occur with regard to the time a particular thing was done, or with regard to whether but one or more instruments of the same nature were prepared at one or at different times.   So far as the defendant's side of the case is concerned, therefore, there is no direct evidence whatever that any executed deed was ever destroyed.   All there is in that regard is that the defendant testified that in May or June, 1912, he prepared a deed which he thinks was signed by the three sisters and acknowledged before Mr. Weber on the day after it was prepared by him.   Its execution and acknowledgment was, however, assumed by the defendant, since he was not present.   When asked whether or not he, as the husband of the deceased, had signed the deed he had prepared, he was unable to say whether he had or had not done so.   If his memory failed him in a matter as important as the signing of the instrument, how can it be said that he could not have been mistaken with respect to time or dates, a matter with respect to which most witnesses do fail, and with respect to which all at times may fail?  The testimony of Ada Stringfellow, a sister-in-law of the defendant, is even weaker than that of the defendant and his sister.   That of the defendant's brother is of no consequence whatever.   While it may be said therefore that from the testimony of defendant and his witnesses, when considered alone, an inference could be deduced that a deed was signed and executed but not delivered and thereafter destroyed, yet, when that testimony is considered, as it must be, in the light of the direct and positive statements of plaintiff's witnesses, the in-

ference entirely fades away. Then, again, the mere fact that the deceased destroyed the deed in the manner stated by Miss Stringfellow lends at least some color to the claim that it was not an executed deed. It is not at all likely, and it certainly is not usual, that one joint grantor will, without consulting the wishes of his co-grantors, destroy an executed deed. This is just what the deceased must have done if Miss Stringfellow's statements are correct. While that might be possible, yet where, as here, there is so much evidence, both direct and indirect, against such an assumption, we are forced to the opposite conclusion, namely, that the paper that Miss Stringfellow testified was destroyed in the nature of things was not, and, in view of all the evidence, could not have been, the deed in question.

In conclusion, we desire to add that while due consideration should always be given to the fact that the trial courts have an opportunity to see and hear the witnesses, and therefore are in a better position to determine the weight or effect that should be given to their statements, or to the statements of any one of the witnesses, yet that fact standing alone cannot always control. This case affords an apt illustration of what has just been stated. In the case at bar, plaintiff's witnesses stand unimpeached either directly or indirectly. Nor is there anything in their statements from which one might say that they were mistaken, much less that they testified falsely. Where there is such an array of credible witnesses, whose reputations stand unassailed, and when there is nothing made to appear why their statements should not be believed, and where at least many circumstances are made apparent why the statements should be believed, this court cannot escape the responsibility of determining what the findings and judgment should be, regardless of what the trial court may have found. Under such circumstances, we must follow our own convictions which naturally spring from a consideration of all the evidence, and enter judgment accordingly.

The judgment therefore is reversed, and the case is remanded to the district court of Salt Lake county, with directions to set aside the findings of fact and conclusions of law and to enter findings of fact and conclusions of law in accord-

ance with the views herein expressed, and to enter a decree restoring the deed in question, as prayed for in plaintiff's complaint. Appellant to recover costs.

STRAUP, C. J., and McCARTY, J., concur.