CRAM et al. v. REYNOLDS et al.

No. 3368. Decided December 12, 1919. (186 Pac. 100.)

1. REFORMATION OF INSTRUMENTS—PROOF OF MUTUAL MISTAKE TO AUTHORIZE REFORMATION MUST BE CONVINCING. Mutual mistakes can be corrected, and courts will reform a contract so as to express what the parties actually agreed on and make it express the terms on which the minds of both parties met, but the proof must be clear, distinct, satisfactory, and convincing, and not merely a preponderance of the evidence.[1] (Page 386.)

2. EVIDENCE—INFERENCE AGAINST PARTY FROM FAILURE TO REBUT ADVERSE EVIDENCE. When a party has the means in his power of rebutting and explaining the evidence adduced against him, if it does not tend to the truth, omission to do so furnishes a strong inference against him. (Page 389.)

3. APPEAL AND ERROR—FINDINGS IN EQUITY MAY BE DISREGARDED. In an equity case, when the findings of fact are clearly not justified by the evidence, in the opinion of the Supreme Court, it is the court's duty to arrive at the conclusion it thinks compelled by the proof, regardless of the trial judge.[2] (Page 392.)

4. REFORMATION OF INSTRUMENTS—MISTAKE IN OMISSION FROM CONTRACT OF WATER RIGHTS OR STOCK SHOWN BY EVIDENCE. Evidence held to show that written contract for the sale of land by defendants to plaintiffs omitted certain water rights or shares of stock in an irrigation company by mutual mistake of the parties known to and fraudulently relied upon by a defendant. (Page 392.)

[1] Wherritt v. Dennis, 48 Utah, 309, 159 Pac. 534; Weight v. Bailey, 45 Utah, 584, 147 Pac. 899; Deseret National Bank v. Dinwoodey, 17 Utah, 43, 53 Pac. 215; Ewing v. Keith, 16 Utah, 312, 52 Pac. 4.

[2] Little v. Stringfellow, 46 Utah, 576, 151 Pac. 347.

Appeal from District Court, Third District, Salt Lake County; *W. H. Bramel,* Judge.

Action by Sidney A. Cram and Lutie M. Cram against C. D. Reynolds and Annie E. Reynolds.

From decree for defendants, plaintiffs appeal.

REVERSED, and CAUSE REMANDED, with directions.

*David W. Moffat,* of Murray, and *Ray Van Cott,* of Salt Lake City, for appellants.

*Dan B. Shields,* of Salt Lake City, for respondents.

WEBER, J.

Plaintiffs brought this action against defendants for the purpose of reforming a certain written contract so as to include within the reformed contract eleven shares in the Cahoon & Maxfield Irrigation Company and for specific performance of the contract when thus reformed. Plaintiffs allege in their complaint the making of the contract and that it was understood and agreed by the parties thereto that defendants should transfer and deliver to plaintiffs as part of the consideration eleven shares of the capital stock of the Cahoon & Maxfield Irrigation Company, but that through the mutual mistake of the parties the eleven shares of stock were omitted from the contract. The bill seeks a reformation of the contract so as to include the eleven shares of stock of the irrigation company. Plaintiffs further in their complaint pray for a decree requiring that defendants perform their part of the contract by transferring and delivering the said eleven shares of stock to plaintiffs. The defendants in their answer admit the execution and delivery of the contract referred to, but deny that said eleven shares, or any part thereof, entered into the consideration of the contract, and affirmatively allege that the contract as written contains all the

terms and stipulations to which the several parties thereto had agreed. The issues were found in favor of defendants by the trial court, and from the decree accordingly entered plaintiffs appeal.

Mutual mistakes can be corrected, and courts will reform a contract so as to express what the parties actually agreed upon and make it express the terms upon which the minds of both parties met. The law on the subject is well established in this jurisdiction. If the same mistake be made by both parties, the contract may be rectified, but the proof must be clear and distinct, as courts do not make contracts for parties. To secure reformation of a written contract which is presumed to be the real contract and to contain all the terms agreed upon, the party seeking relief and demanding reformation of the contract must establish the mutual mistake by evidence that is clear, satisfactory, and convincing, and not merely by a preponderance of the evidence. *Wherritt* v. *Dennis,* 48 Utah, 309, 159 Pac. 534; *Weight* v. *Bailey,* 45 Utah, 584, 147 Pac. 899; *Deseret National Bank* v. *Dinwoodey et al.,* 17 Utah, 43, 53 Pac. 215; *Ewing* v. *Keith,* 16 Utah, 312, 52 Pac. 4. The only question involved in this case is whether the proof produced by appellants, considered in connection with that offered by respondents, measures up to the required standard. The answer to this question necessitates a review of the testimony.

Sidney A. Cram and his wife, Lutie M. Cram, were residents of Idaho in the fall of 1917 and owned a 200-acre dry farm in that state. Desiring to sell or trade their Idaho farm, they inserted an advertisement to that effect in the Salt Lake Tribune. The advertisement was answered October 9, 1917, by C. D. Reynolds and Mrs. Annie E. Reynolds, his wife, respondents herein, who in their letter said they had a small place near Murray, Utah, with a bungalow and two three-room houses on it, ''very best soil that will raise anything; eleven shares of mountain water, enough for twice this amount of land, which is very valuable—about $150 per share now.'' After some correspondence between the parties Reynolds went to Idaho and looked over the Cram farm, and

there said that, if Mrs. Reynolds was satisfied with his description of the property they would consider a trade. During the discussion, in referring to the exchange of property, Reynolds said that he proposed to trade to the Crams property consisting of six acres of land, three brick houses, and eleven shares of water right, the water right or shares being enough for twice the amount of land and being valued at $150 per share. During the conversation Mr. Reynolds asked Cram if he had done any irrigating, and Cram answered in the negative. Reynolds said that a neighbor would show him how to irrigate. Reynolds also stated to the appellants that he secured this water right of eleven shares so he could better sell the place. Three witnesses, Mr. and Mrs. Cram and Mrs. Jennie Harvey, the mother of Mrs. Cram, all testified to the effect that Mr. Reynolds, when in Idaho, positively assured Mr. Cram that he had eleven shares of water right, and that the same would be exchanged in connection with the six acres of land and improvements thereon, and that this water right was enough for twice the amount of land, and that it was of the value of $150 per share. A week or ten days after Reynolds made his visit to Idaho the Crams went to Murray to examine the Reynolds property. While such examination was being made Reynolds explained how the land could be irrigated, and, testifying about this conversation, Mrs. Cram says that they could tell it had been irrigated, and at that time Reynolds said that the water right was in the Cahoon & Maxfield ditch. Appellants further testified that Reynolds promised and agreed that he would turn over the water certificates, one for ten shares and one for one share, at the time the deeds were signed and exchanged. Both of the Crams also testified that Reynolds said that the water went with the land. After examining the Reynolds property a trade was agreed upon, and as part of the agreement a number of articles were to be left on each property. The negotiations continued till Saturday night, November 3, 1917. Mrs. Cram had in the meantime made a memorandum of the personal property to be exchanged. The parties agreed that Mr. D. W. Moffat, a lawyer of Murray who was known to Reynolds, should be em-

ployed to prepare a written agreement. Articles of furniture, machinery, and live stock on both sides were to be exchanged. As the Crams were anxious to return to Idaho, an appointment was made for the next day, Sunday, at Mr. Moffat's office, where the contract sought in this action to be reformed was drawn by the attorney. The deeds had been executed, and the documents were all present and before the parties at the time when Reynolds asked Moffat to step into an outer room of the office out of the presence of Mrs. Reynolds and Mr. and Mrs. Cram. When alone with Moffat Reynolds said: "The water rights in the Cahoon & Maxfield ditch are not specifically mentioned in the contract; will the water rights pass by these deeds we have just signed?" He was told: "The water rights to land pass by deed in the state of Utah unless the water rights are in incorporated companies; if they are in incorporated companies, they do not, but, Mr. Reynolds, you understand the whole basis of this transaction is that you are expected to convey those water rights; they should go in connection with the deal." Reynolds replied, "Do you think they can require me to?" and was told by Moffat, "Yes: not only that, but you ought to," to which Reynolds answered, "Well, I'll let them sweat a little while, anyway." Mr. J. J. Proctor testified to his familiarity with the Reynolds land, which is on what is known as the Olsen fork or branch of the Cahoon & Maxfield ditch; that Reynolds purchased some water rights in the Guilbert fork and had it transferred to the Olsen fork. He further testified that Mr. and Mrs. Reynolds came to his home just the day before he testified in this case, and in the course of the conversation Reynolds said, "I sold this man the water, but he has never paid me for it." James E. Clay testified that Reynolds made application to the directors of the Cahoon & Maxfield Irrigation Company for permission to change the water from the Guilbert fork to the Olsen fork of the Cahoon & Maxfield ditch. This was done shortly prior to the time of the exchange of these respective properties. C. D. Reynolds, one of the defendants, was placed upon the witness stand by the defense, and, after answering some preliminary questions, he was interrogated and answered as follows:

"Q. I will ask you now, does the contract here in evidence marked 'Plaintiffs' Exhibit whatever it is, contain all the items which you agreed to exchange with Mr. Cram? A. Yes, sir. Q. And you are sure that there are no other things that you agreed to exchange with him? A. Yes, sir."

On cross-examination he denied what the Crams said about his claiming that a bobsled had been omitted from the contract. Mrs. Reynolds corroborated the testimony of her husband, but said she did not remember any conversation at Moffat's office, and that the only thing said about the water was after the deeds had been signed, when Mr. Cram said, "Now, you will have to turn over the water." On being recalled to the witness stand Reynolds said he had heard Mr. Moffat testify to the conversation, and that no such conversation was had. He was further questioned by his counsel and answered as follows:

"Q. Was this water some of the material that was left out of the contract at one time and put in at others, and taken back and forth? A. Yes. Q. Was it when Mrs. Cram had reduced this matter to writing and had put down in her book the things she wanted and you had agreed upon the things you would get, was it then you went to Mr. Moffat and had this thing reduced to writing? A. Yes, sir. Q. And there is nothing in the contract, is there, that you didn't agree to give, and there is nothing outside of that contract that you promised to give? A. No, sir. Q. In other words, this contract contains exactly what you agreed to give and exactly what you agreed to take? A. All we finally decided on. Q. And when the deeds were signed and executed you gave exactly what you agreed to give and you got exactly what you agreed to take? A. Yes, sir."

In rebuttal Mr. and Mrs. Cram testified that there never was any conversation between them and Mr. Reynolds at any time when it was agreed that the water right should be left out.

The statement that the water went with the land, repeatedly made by Reynolds, as shown all through the evidence and never denied by him, was intended as and was a statement of fact, not a legal conclusion on the part of Reynolds. If he had said the agricultural implements on the place go with the land, and such implements had been left out of the contract, and that statement had been proven as

clearly, distinctly, and satisfactorily as the statement by
Reynolds that the water went with the land, it would be im-
possible to escape the conclusion that it was the intention of
the parties to the contract to include the agricultural imple-
ments in the exchange. The statements of the Crams that
Reynolds said he would turn over the water certificates when
the deeds were signed; that he said that the water was worth
$150 per share; that when the trade was finally closed
Reynolds said he would have to buy one share of water to
make the 11 shares he proposed to deliver; that Reynolds said
Cram could sell part of the 11 shares of water to pay off the
mortgage on the land obtained from Reynolds; that the water
was water in the Cahoon & Maxfield ditch—none of that testi-
mony is denied by respondents. All they said to negative the
testimony of the Crams was a general and sweeping assertion
that nothing was omitted from the contract. The details of
the conversations with the Crams were carefully avoided, and
the repeated statements by Reynolds that the water went with
the land, and his promises to include the water stock in the
trade, were repeatedly testified to by the Crams, and not once
denied by either Reynolds or his wife. The testimony of the
Crams being uncontradicted except inferentially, what weight
should be given to their testimony? Should it not be accepted
as true? Is there any reason for its exclusion from consid-
eration? The presumption is that Reynolds would have de-
nied that testimony when on the witness stand if he intended
to dispute what the Crams said on that subject. No reason
appears in the record for rejecting the definite and affirmative
testimony of Mr. and Mrs. Cram regarding the water stock.
The fact that the positive testimony of the Crams as to what
Reynolds said in relation to the water stock was not denied by
him adds additional weight to the claims of appellants. It is
a legal maxim that when a party has the means in his power
of rebutting and explaining the evidence adduced against
him, if it does not tend to the truth, the omission to do so fur-
nishes a strong inference against him. *Louisville, N. A. & C.
Ry. Co.* v. *Thompson, Adm'r*, 107 Ind. 442, 8 N. E. 18, 9 N. E.
357, 57 Am. Rep. 120, citing Broom, Legal Max. 936. It is

obvious that on that Sunday at Moffat's law office Reynolds noticed the omission of the water stock from the contract and from the deed, and that he then sought to take advantage of the mistake that had been made. Then it was that he began to palter with his plighted word and in private said to Moffat: "The water rights in the Cahoon & Maxfield ditch are not specifically mentioned in the contract; will the water rights pass by those deeds?" Upon being told that he could be required to transfer the water rights and that he ought to transfer the water stock, he answered: "I will let them sweat a little while, anyway." Reynolds sweepingly denies that such a conversation occurred, but his denial of what was testified to by D. W. Moffat, a reputable member of the bar of Utah, and a citizen of high standing, weakens, if it does not wholly destroy, Reynolds' testimony. When the water shares were later on that night demanded by Mrs. Cram, Reynolds began the sweating process—the process of delaying that which he had agreed to do, not by refusing to deliver the stock, not by saying that the water was not to be delivered, or that the water did not go with the land, but by the petulant declaration that he had signed enough papers and would sign no more that day.

The day before the trial in the district court Mr. and Mrs. Reynolds went to the house of J. J. Proctor, a member of the board of directors of the Cahoon & Maxfield Irrigation Company and its water master. In a conversation then had with Mr. Proctor, Mr. Reynolds, in referring to Cram, said, "I sold this man the water, but he has never paid me for it." Neither Mr. nor Mrs. Reynolds denied the testimony of Proctor. The only explanation of the Moffat and Proctor testimony attempted by counsel for respondents is the statement that, "if the testimony of Moffat and Proctor are to be believed, Reynolds is put in an anomalous position," and if that situation pertains he is "both a fool in the superlative degree and at the same time one of the most designing and crafty of men." Our impression is that Reynolds is not a fool in the superlative degree, nor is he one of the most designing and crafty of men, but the testimony in this case does justify a suspicion

that he is neither exceptionally bright nor particularly honest.

Taking the testimony as a whole, and as we view and weigh it, the conclusion therefrom is irresistible that appellants established the allegations of their complaint by proof clear, satisfactory, and convincing. We fully realize that we have not the advantage of seeing and hearing the witnesses. The weight to be given to the testimony of witnesses often depends greatly upon the appearance, manner, and conduct of the witnesses upon the witness stand, their intelligence, their willingness or unwillingness to testify fully and frankly upon all matters within their knowledge without reference to whom it affects, and whether they are free from passion and prejudice. The learned judge of the trial court had the opportunity of observing all these matters. This court always gives due consideration to the fact that the trial judge saw the witnesses and heard the evidence from their lips, but when in an equity case findings of fact are clearly not, in our opinion, justified by the evidence, it is our duty to arrive at the conclusion we think is compelled by the proof, regardless of the opinion of the trial judge. *Little* v. *Stringfellow*, 46 Utah, 576, 151 Pac. 347. In this case we have read and reread not only the abstract, but the transcript of the evidence, and the conviction is forced upon us that the proof of mutual mistake is overwhelming, and that it has been established by clear, satisfactory, and convincing proof that the 11 shares of water stock described in the complaint were by mutual mistake omitted from the contract sought to be reformed.

The judgment is therefore reversed, and the cause is remanded to the district court, with directions to make findings of fact and conclusions of law in harmony with this opinion, that the contract be reformed, and that as reformed specific performance thereof be decreed; appellants to recover costs.

CORFMAN, C. J., and FRICK, GIDEON, and THURMAN, JJ., concur.