## GEORGE v. FRITSCH LOAN & TRUST CO.
No. 4490.  Decided May 4, 1927.  (256 P. 400.)

*James D. Pardee, Creighton King,* and *Louis E. Callis,* all of Salt Lake City, for appellant.

*Clarence Baird and Dan B. Shields,* both of Salt Lake City, for respondent.

HANSEN, J.

Plaintiff brought this action to enforce the specific performance of a written contract for the sale of real estate. Defendant answered, admitting that it had executed the written contract sued upon and that it was obligated to convey to plaintiff the land described in his complaint, but alleged that the written contract sued upon does not express the intention of the parties in that by mutual mistake of the parties there was omitted from the written contract various provisions to the effect that there is not to be constructed upon the premises any building except a residence or apartment house and that said real estate should not be used for manufacturing purposes or any work of an offensive, dangerous, or noisy nature; nor should any garage, service station, gasoline, or oil distributing station be maintained thereon; nor should any mercantile institution of any sort whatsoever be established or maintained upon said premises. The defendant prayed judgment for a reformation of the written contract so that it would contain these restrictions. Plaintiff replied to the answer and denied that there was a mutual mistake, and also set up as an affirmative defense to the claim for a reformation of the contract of sale that defendant was negligent in the execution of the contract; that it had waived such defense if it ever had any by reason of the fact that it had received payments on the contract for a period of 23 months in a total sum of $1,800; that plaintiff had erected a garage upon said property at a cost of $1,000 during the month of April, 1924; and that defendant had made no claim that said contract did not express

the intention of the parties thereto until after this action was brought by plaintiff for the specific performance of said contract, and that therefore defendant is now estopped from asserting any right or claim for a reformation of the contract.

A trial was had to the court sitting without a jury, and upon the issues affecting the reformation of the contract a decree was entered containing these provisions:

"That the contract entered into between plaintiff and defendant on the 11th day of December, 1923, be reformed by the addition thereto of a restriction clause to the effect that the property described as all of lots 1 and 20 and the south 10 feet of lot 19, block No. 1, Dieter and Johnson Main street addition, Salt Lake City, Utah, shall not be used by plaintiff, or his heirs, executors, administrators or assigns, for a manufacturing plant, or engaging in any work of an offensive, dangerous, or noisy nature, nor anything which shall become an annoyance or a nuisance, nor shall there be established thereon any garage, service station, gasoline or oil distributing station, and that said plaintiff, his heirs, executors, administrators or assigns are hereby restrained from the use of said premises for any of the purposes hereinbefore set forth."

The plaintiff appeals and assails the findings of fact, conclusions of law and judgment as they affect the reformation of the written contract.

The evidence without conflict shows these facts: That the property involved in this controversy is located on the west side of State street near Fourteenth South street where Kensington avenue intersects State street in Salt Lake City, Utah, and is described as lots 1 and 20, and the south 10 feet of lot 19, block 1, Dieter and Johnson Main street addition; that the property in the immediate vicinity of the tract here involved is improved and that the west side of State street is devoted for the most part to manufacturing and business purposes; that in 1923 plaintiff, Louis George, was operating a store and gasoline tank across the street from the property covered by the contract of sale; that he informed one Byron S. Kershaw that he, George, desired to purchase the property involved in this action to keep out

competition; that Kershaw, after ascertaining that defendant company was the owner of the property, took up negotiations with the company for the purchase of the property; that Kershaw and George met W. J. Penner, who was the general manager and secretary of the defendant corporation, and that such corporation was engaged in the real estate business; that in the oral conversations between George, Kershaw, and Penner it was agreed that George would purchase and the company would sell the property in question for $2,500, of which sum $500 was to be paid down and the remainder of the purchase price was to be paid at the rate of not less than $25 per month, all deferred payments to bear interest at 7 per cent per annum; that it was also agreed that Penner would have a written contract drawn up and they would meet the next day and execute the contract; that Penner requested Webster Green, the bookkeeper of defendant company, to prepare the contract, and that the same was prepared by Green; that a printed form of contract was used in which the names of the parties, the description of the property, the amount and terms of payment, together with the rate of interest on deferred payments, and a provision that the seller was to give a marketable title and furnish an abstract, were filled in on the typewriter; that Louis George and Byron S. Kershaw came to the place of business of the defendant company according to appointment on the day following the conversation about the sale of the property; that the contract was then read over by Kershaw to George, and at the request of George the time that each installment must be paid to avoid a forfeiture of the contract was changed from 10 to 30 days; that the contract was then executed by Louis George and the defendant company, Penner signing for the company; that the contract was retained by the defendant, and defendant gave Kershaw a commission for making the sale; that in April, 1924, George erected a frame building on the property at a cost of $1,000, and when erected he used the same as a garage; that plaintiff made payments on the contract promptly (23

in number), and the defendant accepted the same without objection; that in August, 1925, plaintiff tendered to defendant the remainder owing upon the contract and demanded a deed to the property; that defendant company informed plaintiff that if he would pay the remainder of the money it would make conveyance as soon as the mortgage then on the property was paid; that later plaintiff again made tender of the amount unpaid on condition that he receive his deed, but defendant company again failed to deliver the same; that it was not until February, 1926, when the amended answer was filed by defendant company, that any claim for a reformation of the contract was made; that defendant owns other property in the vicinity of the property which is the subject-matter of this action, and that the agent of the company from time to time passed by the property here involved.

In the following particulars the evidence is in conflict.

Byron S. Kershaw was called as a witness by defendant and testified that at the time the negotiations were in progress for the sale of the property Mr. Penner said he would sell the property provided there was not any garage or some other unsightly building placed on the premises; that George said he wanted to buy the property to protect his store from competition and that he would buy it with the understanding that he would not place a garage on it; that he, Kershaw, was not clear as to whether it was a gasoline vending station or other unsightly building, but they did talk about a garage. Webster Green, bookkeeper for defendant company, testified that on two occasions preceding the execution of the written contract he overheard conversations between Mr. Penner and Mr. George and that these conversations were to the effect that there was to be no garage, oil station, or unsightly building erected on the property; that in drawing the contract it was an oversight on his part that these provisions were not put in the contract. W. J. Penner, the general manager of the company, testified that when he talked to Mr. George on the day before the contract was

executed Mr. George said he had a grocery store and wanted to protect himself from competition; that when Penner asked George what he wanted to build on the property he, George, said, "Well, I don't know yet"; that he told George that he, Penner, did not want any garage, service station, oil station, or any manufacturing plant of any nature on the property that would be detrimental to the restricted residential district across the street; that he, Penner, bought the property that George wanted to buy as a protection as some one wanted to buy it for a garage; that it would be impossible to say just the words George used, because he just nodded and said yes to whatever he was asked; that Penner told George that he, Penner, allowed the Intermountain Art to build their building after they had shown Penner the plans for the exterior of the building to be erected; that no machinery of a disturbing nature should be installed to disturb the residential district; that when these expressions were made George nodded and said yes, but did not make any comment; that upon another occasion Penner had a similar conversation with George; that he, Penner, in the presence of George, directed Green to draw up the contract of sale of the property containing restrictions against a service station, garage or anything detrimental to the residential district across the street. Penner further testified that he did not read the contract over before signing the same and did not know that the restrictions were not written into the same until the summer of 1924 after he saw the garage built, and that he then looked over the contract and learned that it did not contain any restrictions. Penner also testified that he saw George in the summer of 1924 and asked him why he had violated the contract, and that George shrugged his shoulders and smiled.

Louis George, the plaintiff, testified that when he made the first payment Penner told him that he did not want him to build a garage on the property, and the George replied and said that he did not know whether he would

or not. George further testified that Kershaw told him that Penner did not want a garage or filling station on the property, to which he, George, replied that he did not know at present what he would do. George denied that Penner had told him that he, George, had violated the contract. He also testified that as the garage was not mentioned in the written contract he assumed that the company was not concerned about whether or not a garage was erected on the property and he therefore decided to and did build the garage.

The foregoing is in substance all of the evidence touching upon the questions material to the determination of the issues in this case.

Appellant has 18 assignments of error, which, however, naturally come under two general propositions, namely: (1) The court erred in finding that there was a mutual mistake in the execution of the written contract and that the parties agreed to the contract as found by the court because the evidence does not support such findings, and that the court erred in entering its decree reforming the written contract. (2) The court erred in failing to make a finding upon whether or not defendant was negligent in the execution of the written contract and also in failing to find whether or not the defendant was guilty of laches and estopped from now asserting any right it may have had to the reformation of the contract.

The law is well settled in this and in other juridictions that a written contract will be reformed to express the agreement of the parties where the proof of the mistake is clear, definite, and convincing, and where the party seeking the reformation is not guilty of negligence in the execution of the contract nor of laches in making timely application for its reformation. The question of the degree of proof required to entitle a party to reformation has been before this court and passed upon in the following cases: Ewing v. Keith, 16 Utah, 312, 52 P. 4; Deseret Nat. Bank

v. Dinwoodey, 17 Utah, 43, 53 P. 215; Weight v. Bailey, 45 Utah, 584, 147 P. 899; Cram v. Reynolds, 55 Utah, 384, 186 P. 100; Wherritt v. Dennis, 48 Utah, 309, 159 P. 534. In this case it will be observed that all of the witnesses for plaintiff definitely testified that during the oral negotiations Mr. Penner informed plaintiff that no garage was to be built on the property and that Kershaw informed plaintiff to the same effect. George admits he talked with Kershaw as well as Penner about the building ■ of a garage, and also testified that he built the garage after assuming the company was not insisting on the restriction against the building of a garage. The evidence relative to the restriction against the construction of a service station is less convincing than that relating to the garage, and the evidence in support of the other reservations provided for in the decree is conflicting and indefinite. We are of the opinion that the evidence amply supports the finding that the parties orally agreed that a garage should not be built upon the property, and, as the learned trial judge heard and saw the witnesses and was thus better able to determine the weight that should be given the evidence than is a reviewing court, we are not disposed to reverse his findings as to the service station. We do, however, entertain very grave doubt as to the sufficiency of the evidence to sustain any of the other findings as to the reservations that the parties orally agreed upon. But as this case must be reversed upon other grounds, it is not necessary to further discuss this phase of the case.

Counsel for appellant contend that defendant is not entitled to a reformation of the contract in any event because of the negligence of the officers and agents of defendant corporation in the drawing and execution of the written contract. Counsel for appellant insist that one who signs a contract without first reading or having the same read has no standing in a court of equity to either avoid or reform such a contract. A number of cases cited sus-

tain appellant's contention. Other cases take an opposite view. We shall not attempt to review all of the numerous cases and authorities upon this phase of the law nor the impossible task of harmonizing the various views expressed. A few citations will illustrate the trend of judicial opinion.

In 34 Cyc. 948, the law is thus stated:

"Against a party seeking reformation, broadly speaking, it is a good defense to set up and prove that the mistake charged was due to the complaining party's own negligence. Yet, although carelessness, ignorance, negligence, or forgetfulness, in themselves, are not grounds for reformation, equity will not always refuse reformation merely because the mistake was the result of carelessness, ignorance, negligence, or forgetfulness. Nevertheless, the mistake must have been shared in by all the parties and not be attributable solely to the negligence of complainant."

The author in 4 Page, Contracts (2d Ed.) § 2219, in discussing the rule that one who is guilty of negligence in the execution of a contract is not entitled to a reformation, uses the following language:

"The courts which have laid down this principle have apparently failed to distinguish between the cases in which the parties entered into a valid contract and by mistake failed to set forth the terms of such contract in the writing to which they attempted to reduce it, and the cases in which an offerer has by mistake included terms in his offer which he did not mean to include, or in which the offerer has used the words in his offer which he meant to use, but in which he has been induced to make such offer by reason of mistake. In the cases of the two latter groups it is generally held that if the offeree does not know of the mistake and does not take advantage of it, the offer and acceptance must amount to a valid contract, since the offeree is entitled to rely upon the offer as it is communicated to him by the offerer without any regard to the actual state of mind of the offerer. If a valid oral contract has been entered into and reformation is granted, the party against whom such relief is granted does not lose any of the benefits of the bargain into which he entered, but he only loses the unfair advantage which he is seeking to gain by reason of the mistake of the adversary party. For these reasons some of the courts which appear to insist upon the theory that negligence on the part of the plaintiff will prevent reformation, have modified this

principle so as to leave a number of cases in which negligence may exist and yet reformation may be granted."

In 10 R. C. L. § 40, p. 296, the author says:

"However, the rule as stated in several cases, and as it has been adopted by various text-writers of high authority, is that equity will not furnish relief where the mistake has arisen concerning facts in reference to which the mistaken party had 'means of knowledge,' or 'might have ascertained the truth.' While it may have been true formerly, it has in later years been very much relaxed, so that, as thus broadly stated it can no longer be said to be borne out by the authorities. In truth the later cases seem to establish the doctrine that whenever there is a clear bona fide mistake, ignorance, or forgetfulness of facts, the contract may be avoided. Thus it is a common thing for courts of equity to relieve parties who have by mistake discharged mortgages on record, although the facts concerning which the mistake was made were a matter of record at the time. Not every negligence, therefore, will stay the hand of a court of equity, but each instance of negligence must depend, to a great extent, on its own circumstances. The conclusion from the best authorities seems to be, that to constitute culpable negligence the neglect complained of must amount to the violation of a positive duty. The highest possible care is not demanded. Even a clearly established negligence may not, of itself, be a sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby."

From a review of the authorities cited by counsel in their respective briefs, together with other cases and text-writers, we are of opinion that the better rule is that where the parties have in advance orally agreed upon the terms of a contract and later in reducing the contract to writing some of its terms are omitted by inadvertence or mistake, no absolute rule can be laid down, but in determining whether either of the parties is entitled to have the contract reformed to express the oral agreement of the parties, much depends upon the particular facts and circumstances of each case.

The facts in this case show that the parties were dealing at arms' length; that the contract was drawn by

the agent of defendant company; that defendant was engaged in the real estate business; that it retained the written contract; that plaintiff in reliance upon the executed contract, erected a garage building at a cost of $1,000; that defendant owned property in the immediate vicinity and its agents frequently passed by this property, and in the summer of 1924 knew that the garage building was erected; that defendant continued to receive installment payments without objection until July, 1925, and when tender of the final payment was made in August, 1925, defendant was entirely willing to receive the same, and that not until the amended answer was filed did the defendant company make any claim that the contract should be reformed. Nor can it be said that plaintiff was guilty of bad faith in erecting the garage. When we consider that defendant's agent drew up the written contract, omitted any mention of restrictions, retained such contract for several months and received the payments thereon, plaintiff may well be justified in assuming that the company was not concerned about the erection of the garage upon the property, particularly in view of the fact that the other property on the same side of the street was being used for manufacturing and business purposes.

The general rule is that relief in the way of reform of a written instrument should not be granted when the party seeking it has acquiesced in the written agreement after being aware of the mistake. 28 L. R. A. (N. S.) 981, and cases there cited; 34 Cyc. 942, and cases cited in foot note.

Plaintiff's reply raises issues as to the negligence of defendant in the execution of the contract, as to defendant's laches in failing to make timely application for reformation of the contract, and as to the estoppel of defendant by its conduct and the injury that would result to plaintiff if the contract is reformed. It was the duty of the trial court to make findings upon these issues.

472

*Michell* v. *Jensen et al.*, 29 Utah, 346, 81 P. 165; *Dillon Implement Co.* v. *Cleveland et al.*, 32 Utah, 1, 88 P. 670; *Holm* v. *Holm*, 44 Utah, 242, 139 P. 937; *I. X. L. Stores Co.* v. *Moon*, 49 Utah, 262, 162 P. 622. In this case there was negligence on the part of defendant's agent in preparing the contract and in not reading or having the same read before it was signed. There were laches in not seeking timely relief, and to now permit the reform would result in injury to plaintiff which would doubtless not have occurred had defendant not been negligent or had it acted promptly. Under such circumstances we are of opinion that both upon principle and authority defendant is not entitled to a reformation of the contract. Having reached this conclusion upon the undisputed evidence in this case we can see no purpose in directing a new trial, as the results of a new trial must lead to the same conclusion. It is therefore ordered that the judgment herein be and the same is hereby reversed, and the cause is remanded to the district court of Salt Lake county, with directions to that court to make findings of fact conclusions of law and decree in accord with the views herein expressed; plaintiff to recover his costs.

THURMAN, C. J., and CHERRY and Straup, JJ., and CHRISTENSEN, District Judge, concur.

FRICK, J., did not participate herein.