## SINE et al. v. HARPER

No. 7386.   Decided September 16, 1950.   (222 P. 2d 571)

416

See 31 C. J. S., Evidence, Sec. 256.  Mutual mistake in reforming deed, 91 A. L. R., 1514.  See, also, 16 Am. Jur. 463.

*Robert S. Richards, Grant Macfarlane,* Salt Lake City, for appellant.

*Richards & Bird,* Salt Lake City, for respondents.

LATIMER, Justice.

The principal question before us is the propriety of a judgment entered in the court below reforming a contract for the sale of real property entered into between Jerry Sine and Dora A. Sine, his wife, and Cathrine Jensen, now deceased. Other less important questions will be disposed of in the course of the opinion. The action was commenced against Cathrine Jensen while still living, but she died before trial and the present defendant was substituted as her personal representative. The lower court determined the contract as written did not express the agreement reached by the parties and entered a decree reforming the instrument. The executrix appeals from the judgment of reformation and the plaintiffs cross assign error on the admission in evidence of statements made by Mrs. Jensen after the signing of the agreement. In view of our holding on appellant's contention we need not review the cross assignments of error. The parties will be designated as they appeared in the court below.

For the purpose of assisting the reader in following the statement of facts a plat of part of Lot 3, Block 61, Plat "C," Salt Lake City Survey, is furnished. The property involved is the 25.5-foot piece indicated by the shaded portion of the plat.

Jerry & Dora A. Sine

50.0'

Jerry & Dora A. Sine

50.0'

Richard Gamlin

25.0'

Jerry & Dora A. Sine

33.0'

112'

Sparta Street

Catherine Brady

Catherine Brady

Jerry & Dora A. Sine

49.5'

25.5'

49.0'

NORTH TEMPLE STREET

On or about the 27th day of July, 1947, a real estate agent by the name of Joseph J. Dowell was transacting other business for the plaintiffs and a discussion ensued with respect to the purchase of the property on the west of and contiguous to that owned by plaintiffs. In this conversation Dowell was informed by the plaintiff Jerry Sine that he and his wife were interested in buying that particular piece of property so that they could properly square off their premises. The correct name and residence of the true owner was not known by either of the parties so Dowell was required to make some independent investigation. He located Mrs. Jensen, the owner, and contacted her with respect to the purchase of the property. Dowell gives the following version of this conversation: He stated to Mrs. Jensen that he understood she owned some property on West North Temple, adjoining the Bishop's Auto Court (this auto court was the property owned and operated by the plaintiffs); Mrs. Jensen answered that she was the owner; Dowell then requested information as to whether it was for sale; Mrs. Jensen replied she was willing to sell, provided the price was satisfactory; Dowell then asked what she would take for the property including his commission for the sale; Mrs. Jensen stated she wanted $8,500; Dowell answered that he was only authorized to offer $8000; Mrs. Jensen requested information as to who was to purchase the property and after some hesitation Dowell notified her that it was to be purchased by Mr. Sine "who owns the auto court next to it"; Mrs. Jensen stated that he should be willing to pay more for it than anyone else, to which Dowell replied that the main reason he would pay more was because he desired to square or straighten out his other property and build a cafe; Mrs. Jensen answered that at one time she had in mind building a restaurant, but her health would not permit it and that, while her children wanted her to hold on to the property, she was glad to dispose of it because she was unable to care for it properly.

The $8,000 deal was not agreeable to Mrs. Jensen so there was a second conversation between her and Dowell, at which time an agreement was reached. In this second discussion Dowell claims there was a conversation about the dimensions of the lot and as part of this conversation he remarked to Mrs. Jensen that she was getting more than $100 per front foot for the property; that a piece of property down the street sold for $85 per front foot and that the price was high, particularly in view of the fact that the purchaser was going to tear down the house.

At the time of these conversations neither Mrs. Jensen nor Dowell knew the legal description of the property and so, for the most part, their conversations identified the property either as next to Sine's or as "656-658 West North Temple." The original Earnest Money Receipt dated July 29, 1947, which was the first document signed by the parties, does not contain a legal description but merely identifies the property being purchased by the street numbers. These numbers had been assigned to a duplex which was located on the west 49.5 foot portion of the premises. On the 31st day of July a Uniform Real Estate Contract was prepared in Dowell's office and the property is described in this instrument as 656-658 West North Temple Street, but the following legal description is likewise included: "Commencing at the Southwest corner of Lot 3, Block 61, Plat 'C' Salt Lake City Survey, and running thence East 49½ feet; thence North 115 feet, to an alley; thence West along the South side of said alley 49½ feet; thence South 115 feet to the place of beginning."

During the course of the early negotiations Mrs. Jensen obtained an abstract to the 49.5 foot piece of property and turned it over to Dowell. He had the abstract brought up to date and it was subsequently turned over to attorneys for Sine for title inspection. There is a plat on the first page of the abstract which shows the dimensions of the tract of

land covered as being 75 feet by 115 feet and the description contained on this page uses the same dimensions. The entries in the abstract finally deal with the 49.5 by 115 foot westerly portion of the tract, but the plat has never been changed to show a reduction in the size of the property covered by the abstract. Mrs. Jensen had a separate abstract on the eastern 25.5 foot piece of property, but this fact was unknown to plaintiffs or Dowell and the record is silent as to whether Mrs. Jensen knew the extent of the property covered in the abstract furnished.

Attorneys for the plaintiffs searched the abstract of title and recommended that an affidavit be obtained clarifying the discrepancies in the names of certain of the grantors. This affidavit, which was dated the 14th day of August, 1947, carries the same description and dimensions as the contract of sale. On the 20th day of November, 1947, unbeknown to plaintiffs, Mrs. Jensen paid the taxes on the 25.5 foot piece. Payments were not made by her on the larger tract, in spite of the fact that the contract required that she pay the taxes up to and including August 1, 1947. On August 25, 1948, after this suit had been instituted, Sine paid the taxes on the 49.5 foot piece.

In July of 1948, Mr. Jensen, the then husband of the seller, was doing some work at the auto court and he testified that she told him to try to sell Sine the 25.5 foot piece; that pursuant to her directions he contacted Mrs. Sine at the auto court and asked her if she knew that the 25.5 foot piece was not included in the sale; and that Mrs. Sine expressed great surprise at the information. Shortly thereafter, on July 22, 1948, this action was commenced.

According to the testimony of some of the daughters of Mrs. Jensen, her former husband and her husband at the time of the sale, she informed them at various times subsequent to the sale that she had not sold the 25.5 foot piece of property; and, that it could be used either for the

purpose of building a home for her former husband or for erecting a hamburger stand which he could operate to earn a living. One daughter claims to have driven by the place with Mrs. Jensen when the latter pointed out the retained portion of the property.

Title to the full 75 foot tract came to Mrs. Jensen by two separate deeds. In 1930 the 49.5 foot strip was deeded to her and in 1939 she obtained title to the 25.5 foot strip. Up until 1912 the abstract describes the property as one piece 75 feet by 115 feet. At that time the two pieces were transferred as separate parcels. Without scrutinizing the abstract or the public records, a prospective purchaser would have little chance of knowing this, as there was no dividing line between the two pieces of property; the smaller eastern piece was used for parking purposes by the tenants in the duplex; there was rubbish and old auto parts on the easterly portion, which was unimproved; and, there was a clothes line extending over part of both pieces. The appearance of the property is such that one familiar with its location and use could have reasonably believed it was a single parcel of land devoted to a single purpose. After the Sines purchased the property they cleaned up the premises, including the 25.5 foot piece and assumed possession of the full 75 foot parcel.

In her last Will and Testament executed on the 24th day of February, 1948, almost seven months after the sale, Mrs. Jensen made a specific bequest of her interest on this property to one of her daughters. In that document she identified the premises by the address 656-658 West North Temple. A division of the tract into two pieces is not suggested by her in this instrument.

The appellant has made five assignments of error which can be grouped under three points: First, that the court erred in admitting in evidence certain incompetent testimony; second, the judgment is erroneous in that it vali-

dates an oral contract for the sale of land contrary to the statute of frauds; and third, the evidence is not sufficiently clear and convincing to sustain the judgment of reformation.

Under point (1) the appellant contends (a) that the court erred in permitting plaintiff to testify to the statements made to Dowell concerning the purchase of the premises; (b) the court erred in permitting Dowell to testify to conversations with Cathrine Jensen in violation of Section 104—49—2 (3), U. C. A. 1943, commonly referred to as the "dead man's statute"; and (c) the court erred in admitting evidence which had a tendency to vary the terms of a written contract. We shall dispose of these in the order stated.

Apparently, there is some misunderstanding as to when evidence is inadmissible because of the hearsay rule. Jones, Commentaries On Evidence, Second Edition, Vol. 3, page 2017, states the guiding principle in the following language:

"'that something which should come through an original witness is sought to be put in at second hand, by one to whom it has been told, one who is not a witness properly speaking, who did not perceive it and cannot therefore testify to it, but only to the fact that somebody said so. It would operate to nullify the requirement that witnesses should personally appear and testify publicly in court, if the statements of the original perceiver could be got in through another person; and it was always the rule that witnesses should thus publicly appear and testify.'"

In determining whether the statements made by the plaintiff Jerry Sine to Dowell were admissible, attention must be given to the issues involved. The action was to reform an instrument because of a mutual mistake of fact. Two of the elements which must be established by the plaintiffs are that they had a belief that the purchase involved the full 75 foot frontage and that the scope of the agent's authority did not permit him authority to decrease the front footage. If these could not be established then the

action would necessarily fail as there could be no mistake on their part. If plaintiffs had an intent to only purchase 49.5 feet of property, or if they believed the writing was in accordance with their intention and the intention of Mrs. Jensen, or if Dowell had been instructed that he could use his own judgment on the purchase of part of the property, then they were not entitled to succeed in this action. It does not follow because the statements were those made by the plaintiffs to Dowell in the absence of Mrs. Jensen that they are to be considered as hearsay. On the contrary, they are direct evidence of material issues given by a witness with first-hand knowledge. Dowell perceived the evidence, was competent to testify to it and could be cross-examined about the nature and extent of it. The evidence in part was legal proof of a state of mind of which there was no other or better evidence. Plaintiffs had no direct contact with Mrs. Jensen at any time and their beliefs and understandings were carried to her by Dowell. The best way in which it could be established that they believed their contract involved the complete tract would be by showing the instructions they gave Dowell when they requested that he attempt to purchase the property. The evidence was not introduced for the purpose of establishing Mrs. Jensen's intent or what Dowell may have told her. It was limited to the purpose of either showing the beliefs of plaintiffs or establishing the extent of the agent's authority.

In the case of *Webb* v. *Webb,* 116 Utah 155, 209, P. 2d, 201 204, we answered a somewhat similar contention. In that case the question involved was whether or not an attorney could testify as to certain statements made by a husband in obtaining a divorce from his wife who was not present at the time the statements were made. Mr. Justice WADE, speaking for the court, announced the folowing rule:

"The conversations between the attorney and the decedent show the attorney's authority and the purposes and limitations of such authority. The conversations between the attorney and respondents showed negotiations for and the consummation of a deal with respondents in accordance with the attorney's authority. There was no assertion by an extra-judicial witness of a material fact for the purpose of proving the existence of such fact, but the fact that such conversations occurred were circumstances which showed the purpose and intention of decedent to convey to the respondents unconditionally. The attorney was the one who acted for the decedent in the transactions involved herein and his evidence was competent to relate his version thereof and a relation of the conversations he had with the principals in the transaction was not hearsay, even though it necessarily included statements made by the other parties to the conversation which were not made in the presence of appellant."

Even if we were to concede the evidence was hearsay it is competent because of being within an exception to the hearsay rule. Again quoting from Jones Commentaries on Evidence, Section Edition, Vol. 3, supra, page 2012, we find the following statement:

" 'The rule is thoroughly well settled,' remarks the California court, 'that, when the intention, feelings, or other mental state of a certain person at a particular time, including his bodily feelings, is material to the issues under trial, evidence of such person's declarations at the time indicative of his then mental state, even though hearsay, is competent as within an exception to the hearsay rule.' "

We conclude the questioned evidence was admissible.

Section 104—49—2, U. C. A. 1943, prescribes that certain witnesses shall be disqualified to testify. The subsection of particular importance in this action is as follows:

"(3) A party to any civil action, suit or proceeding, *and any person directly interested in the event thereof*, and any person from, through or under whom such party or interested person derives his interest or title or any part thereof, when the adverse party in such action, suit or proceeding claims or opposes, sues or defends, as guardian of an insane or incompetent person, or as the executor or administrator, heir, legatee or devisee of any deceased person, or as guardian, assignee or grantee, directly or remotely, of such heir, legatee or devisee, as to any statement by, or transaction with, such deceased, insane or incompetent person, or matter of fact whatever, which must have been equally within the knowledge of both the witness and such insane, incompetent or deceased person, unless such witness is called to testify thereto by such adverse party so claiming

or opposing, suing or defending, in such action, suit or proceeding." (Emphasis added.)

The question requiring an answer is, did the legislature intend to seal the mouths of agents when it used the words "or any person directly interested in the event thereof?" In view of the fact that the section limits the introduction of testimony which might be of value in determining the ultimate truth, we are inclined to narrowly construe the quoted phrase.

For certain purposes, and at times inconsistently, both plaintiffs and defendant seek to claim Dowell as being their agent. He was first contacted by plaintiffs for the purpose of purchasing the property for them. He later dealt with Mrs. Jensen and received his fee from her. It seems to us that in deciding this contention it is not necessary to decide whether he was an agent for either party, for both the parties, or whether he was an independent contractor whose statements could not be charged to either party. His interest, if any, in the transaction was that he should earn a commission and get paid for his work. He would receive no more pay if the contract was reformed as his fee was based on the amount of money realized, not the amount of land sold. He had certain obligations to each of the parties and it is difficult to see why he should be more interested in satisfying plaintiffs than he would be in properly handling Mrs. Jensen's affairs. Defendant asserts that he naturally would be interested in plaintiffs' version of the agreement as he felt he was responsible for the mistake. On the other hand, it could be asserted by plaintiffs that he would favor the defendant because if he made a mistake and the contract was rescinded he might be required to return his commission. Laying aside these suggested reasons for preference, it appears that Dowell's interest, if any, was not such as would render him incompetent. The interest in an action which under the statute disqualifies a witness from testify-

ing must be an actual financial interest that will result in pecuniary gain or loss to the witness. It has nothing to do with his understanding, feeling, sympathy, or desires. These elements may affect his credibility but not his competency.

In the case of *Burnham* v. *Eschler*, 116 Utah 61, 208 P. 2d 96, 100, we were faced with the contention that a husband of a grantee could not testify as to certain statements made by the grantor because he was an interested party within the meaning of the statute. Mr. Justice WOLFE, speaking for the court, disposed of that contention in the following language: "One further assignment of error must be disposed of. Was Mr. Eschler competent to testify as to his conversation with the deceased at the time of the delivery? The plaintiffs claim he is a 'party directly interested in the event' of this action and, therefore, incompetent to testify under Sec. 104—49—2, subsection (3) U. C. A. 1943, providing, as it concerns us here, that a party to a civil action, and any person directly interested in the event thereof, where the adverse party sues as administrator or heir of a deceased person, cannot testify as to any statement by, or transaction with, the deceased, or matter of fact whatever, which must have been equally within the knowledge of both the witness and the deceased person, unless called to testify by said adverse party. Particularly do they object to his testimony that Mrs. Schank expressed the desire that she continue the payment of the taxes and expenses incident to the management of the property described in the deeds in order that neither the defendant nor Mr. Eschler be financially burdened. While, of course, had Mrs. Schank not assumed the payment, Mr. Eschler might well have been called upon to shoulder this responsibility, still this is not a 'direct interest' as contemplated by the statute. If Mr. Eschler had a direct interest, it was an interest in the transaction testified to, and not in the event of this action. In the annotation at L. R. A. 1917A 32, cases are cited holding that the interest

in the action must be pecuniary, direct, immediate, and not uncertain, contingent or remote, and that a husband is not incompetent because he may become a beneficiary under his wife's will or succeed to her property by her intestacy. We held in *Olson* v. *Scott,* 61 Utah 42, 210 P. 987, that the plaintiff's husband was entirely competent to testify as to statements made by the plaintiff's deceased mother to the effect that certain bank deposits belonged to the plaintiff. *Mower* v. *Mower,* 64 Utah 260, 228 P. 911, and the general rule on this point as stated in 58 Am. Jur. 195, Sec. 319, are in accord with this result. See also *Clawson* v. *Wallace,* 16 Utah 300, 52 P. 9."

If Dowell's interest in the action must be pecuniary, direct, immediate and not uncertain, contingent and remote then his testimony was competent. His interest in the action must of necessity be remote and uncertain and then, only non-pecuniary. He could have no possible pecuniary interest in the reformation of the deed as a holding that the parties had agreed to purchase and sell 49.5 feet would not deprive him of his earnings. Neither would he suffer a loss of his commission if the contract was reformed. In this event the court would have to find the parties agreed on the full 75 feet and as long as there is a completed contract the commission is due. The fact that he may feel a moral responsibility for a mistake and seek to correct a wrong he believes he created, does not place him in a category where he is a party directly interested in the event. Accordingly, we overrule this assignment of error.

Appellant is in error in her contention that testimony concerning the mistake was inadmissible because it varied the terms of a written contract. If such a contention could be sustained then the equitable theory of reformation of contracts would not apply to written instruments. The right to reform is given, at least in part, so as to make the written

instrument express the bargain the parties previously orally agreed upon. When a writing is reformed the result is that an oral agreement is by court decree made legally effective although at variance with the writings which the parties had agreed upon as a memorial of their bargain. The principle itself modifies the parol evidence rule.

Williston on Contracts, Rev. Ed., Vol. 5, Sec. 1552, states the rule as follows: "The right of reformation whenever allowed is necessarily an invasion or limitation of the parol evidence rule, since when equity reforms a writing it enforces an oral agreement at variance with the writing which the parties had agreed upon as a memorial of their bargain. This limitation is necessary to work justice, and there seems no more reason to object to it in case of reformation than in case of recission for fraud or for mistake. In either case, unless the mistake precludes the existence of a contract at law, it should not be denied that the writing correctly states the actual contract or conveyance which has been made, but since it is inequitable to allow the enforcement of it, and since justice requires the substitution of another in its place, equity gives relief where reformation is appropriate, and to that end necessarily admits any relevant parol evidence.  *  *  *"

We answer defendant's second point that the court erred in reforming the written contract because to do so was in violation of the statute of frauds. Insofar as concerns the statute of frauds, there are two general classes of contracts for the sale of land which embrace all parol variations. The first class includes agreements where the written contracts through mistake include lands which were not intended to be conveyed, and the second class includes agreements where the written contracts through mistake exclude lands intended to be sold and conveyed. This action involves the latter class. Some authorities refuse to permit contracts of this class to be reformed on the theory that the modifi-

cation enlarges the real estate embraced in the writing and conveys property when there is no instrument covering the subject matter signed by the party to be charged. Pomeroy, Equity Jurisprudence, 5th Ed., after discussing the general classes in Paragraph 866, states his understanding of the better view in the following language:

"The doctrine in all its breadth and force is maintained by courts and jurists of the highest ability and authority, which hold that, whether the contract is executory or executed, the plaintiff may introduce parol evidence to show mistake or fraud whereby the written contract fails to express the actual agreement, and to prove the modifications necessary to be made, whether such variation consists in limiting the scope of the contract or in enlarging and extending it so as to embrace land or other subject-matter which had been omitted through the fraud or mistake, and that he may then obtain a specific performance of the contract thus varied, and such relief may be granted although the agreement is one which by the statute of frauds is required to be in writing. This view, in my opinion, is not only supported by the overwhelming preponderance of judicial authority, but is in complete accordance with the fundamental principles of equity jurisprudence. Indeed, the other theory, as will more fully appear in the sequel, has no *necessary* connection with specific performance; if adopted and consistently carried out, it would necessarily restrict within narrow bounds the most salutary equitable remedy of reformation. The same broad view of the doctrine is clearly illustrated in the treatment of executed contracts of conveyances of land. It is settled by the great preponderance of authority that a deed of land may be thus corrected by enlarging its scope, extending its operation to other subject-matter, supplying portions of land which had been omitted, making the estates conveyed more comprehensive, as changing a life estate into a fee, and the like, and by enforcing the instrument thus varied against the grantor. If the doctrine can be thus applied to deeds which have actually conveyed the title, then *a fortiori* may it be applied to mere executory contracts which do not disturb the legal title. No such relief, however, can be granted, either when the contract is executory or executed, and no parol evidence can be used to modify the terms of a written instrument, and most emphatically when that instrument is required by the statute of frauds to be in writing, except upon the occasion of mistake, surprise, or fraud; one or the other of these incidents must be alleged and proved before a resort can be had to parol evidence in such cases. This is certainly the general rule, and the exceptions to it are more apparent than real."

American Jurisprudence, Vol. 45, Reformation of Instruments, paragraph 17, announces the same general rule. That section provides:

"According to many authorities, executory contracts within the statute

of frauds may be reformed by enlarging as well as by restricting their terms, the statute being regarded as inapplicable so as to prevent a court, in a case of fraud or mistake, to declare the contract to be as the parties have made it. According to some courts, therefore, a court of equity may correct a mutual mistake in a contract by including the part omitted, and then enforce the contract as reformed, notwithstanding the apparent prohibition of the statute of frauds. By so doing, the court is not decreeing performance of an oral contract. The contract as made is in writing and as reformed it is still a written contract. made so by decree of court."

Appellant quotes from page 4365, Section 1555, Williston on Contracts, Revised Edition, as holding in her favor. We believe that quote is consistent with the other authorities cited herein. One of the cases referred to by Mr. Williston is *United States* v. *Motor Trucks, Limited,* a Canadian case, appealed to the House of Lords, 1924 Law Reports 196. The Court there said: "It was further suggested that the present action involved an attempt to enforce a parol contract inconsistently with the principle of the Statute of Frauds. It is, however, well settled by a series of familiar authorities that the Statute of Frauds is not allowed by any Court administering the doctrines of equity to become an instrument for enabling sharp practice to be committed. And indeed the power of the Court to rectify mutual mistake implies that this power may be exercised nothwithstanding that the true agreement of the parties had not been expressed in writing. Nor does the rule make any inroad upon another principle, that the plaintiff must show first that there was an actually concluded agreement antecedent to the instrument which is sought to be rectified; and secondly, that such agreement has been inaccurately represented in the instrument. When this is proved either party may claim, in spite of the Statute of Frauds, that the instrument on which the other insists does not represent the real agreement. The statute, in fact, only provides that no agreement not in writing and not duly signed shall be sued on but when the written instrument is rectified there is a writing which satisfies the statute, the jurisdiction of the Court to rectify being outside the prohibition of the statute."

We prefer to follow the rules which permits the reformation of contracts in cases such as this, particularly where, as here, the instrument contains all of the terms necessary to comply with the statute of frauds but through a mistake of fact one or more of the essential terms is omitted or by mistake incorrectly stated. The adoption of this principle is in keeping with the theory that the statute of frauds should not abridge the remedy of reformation and should not be used as a shield to prevent the instrument from being reformed to show the true intent of the parties. We, therefore, conclude that the reformation is not prohibited by the statute' of frauds.

The last point raised by defendant, which is that the evidence is not sufficiently clear and convincing to sustain the judgment, gives us more concern. The general rule is stated in Restatement of the Law of Contracts, Section 511, as follows:

"It is essential in order to obtain a decree rescinding or reforming a written conveyance, contract, assignment or discharge for mistake, that the fact necessary for the allowance of the remedy shall be proved by clear and convincing evidence and not by a mere preponderance."

In *George v. Fritsch Loan & Trust Co.*, 69 Utah 460, 256 P. 400, 403, Mr. Justice Hansen stated the law in this jurisdiction to be as follows:

"The law is well settled in this and in other jurisdictions that a written contract will be reformed to express the agreement of the parties where the proof of the mistake is clear, definite, and convincing, and where the party seeking the reformation is not guilty of negligence in the execution of the contract nor of laches in making timely application for its reformation. The question of the degree of proof required to entitle a party to reformation has been before this court and passed upon in the following cases: *Ewing* v. *Keith*, 16 Utah 312, 52 P. 4; *Deseret Nat. Bank* v. *Dinwoodey*, 17 Utah 43, 53 P. 215; *Weight* v. *Bailey*, 45 Utah 584, 147 P. 899; *Cram* v. *Reynolds*, 55 Utah 384, 186 P. 100; *Wherritt* v. *Dennis*, 48 Utah 309, 159 P. 534."

It is not difficult to follow the reasoning of the quoted authorities and reaffirm the principle of law that the evi-

dence necessary to establish a mutual mistake of fact must be clear and convincing. The difficult principles to apply are: When is evidence clear and convincing; and who has the ultimate responsibility of making this determination? If we arrogate the responsibility to ourselves, then the trial judge becomes only a conduit through which the evidence passes and his participation amounts to merely a ministerial act in getting the record to this court. We are not in favor of that procedure. If, on the other hand, we acknowledge his preferred position and accord to him the right to draw his own conclusions, then our review powers are narrowed. As thus narrowed, we are required to determine whether within a rather restricted zone the evidence is sufficient to satisfy us that the trial judge could, by believing the testimony of certain witnesses and by making reasonable inferences therefrom, reasonably find that the evidence was both quantitatively and qualitatively sufficient to be clear and convincing. The adoption of such a rule gives the trier of the facts some latitude in making his determination and is in keeping with our method of procedure. Our function as an appellate court is not to substitute our judgment for that of the trial judge, but it is to determine whether his findings are based on evidence which we can say meets the minimum standards of being clear and convincing.

The trial court is in a more favorable situation to deal with many of the imponderables arising in a trial of an action than are we. We acknowledge his vantage point on such things as demeanor and credibility and we realize that the "live show" he watches is far more effective in disclosing the ultimate truths than are the typewritten pages of a transcript. We appreciate his better opportunities for searching out inaccuracies, untruths, exaggerations, and concealed bias or interest and if we are to fully accept his advantageous position we must allow him some latitude in giving weight to elements we are unable to evaluate.

The court below determined that the evidence was suffi-

ciently clear and convincing to satisfy his mind beyond a reasonable doubt that a mutual mistake of fact existed. We are, therefore, compelled to analyze the evidence and determine whether it is sufficient from the standpoint of quality and quantity to sustain the findings of the trial judge. While the terms "clear and convincing" are relative and are not capable of measurement, they carry an element of certainty. Mr. Justice WOLFE, in the case of *Greener* v. *Greener*, 116 Utah 571, 212 P. 2d 194, 204, defines "clear and convincing in a very appropriate way. In that opinion he distinguishes between the phrases "preponderance of the evidence" and "clear and convincing evidence" in the following language:

"* * * That proof is convincing which carries with it, not only the power to persuade the mind as to the probable truth or correctness of the fact it purports to prove, but has the element of clinching such truth or correctness. Clear and convincing proof clinches what might be otherwise only probable to the mind.

"We have no measuring rod to lay alongside of the proof to ascertain whether it meets the various tests signified by the terms 'barely' or 'merely' or 'slightly' preponderating or 'fairly,' 'greatly' or 'overwhelmingly' preponderating. Nor can we measure the content of such terms as 'clear and convincing,' 'beyond reasonable doubt' (which we take to mean the same as free from reasonable doubt), 'unquestionably convincing,' etc. These terms deal with states of mind and to a degree vary as to the content put into them as minds vary. They all have implicit in them the idea of comparativeness, each with other standards, signifying more or less degrees of proof.

"But for a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains no serious or substantial doubt as to the correctness of the conclusion. A mind which was of the opinion that it was convinced and yet which entertained, not a slight, but a

reasonable doubt as to correctness of its conclusion, would seem to be in a state of confusion."

There can be little question about the fact that the evidence concerning Sines' mistake was clear and convincing. There is not a scintilla of evidence in the record which would indicate that either Mr. or Mrs. Sine contemplated the purchase of a tract less than the full 75 feet. Their acts, statements and conduct before the purchase establish beyond reasonable doubt that they believed at all times that the 25.5 foot parcel was included in the purchase. Their actions after discovering the mistake fortify that conclusion. When Mr. Jensen, the husband of deceased, suggested to Mrs. Sine that the piece in dispute had not been purchased, she was shocked and surprised. Immediate steps were taken to correct the mistake and suit was instituted while Mrs. Jensen was living. Her death increases the difficulty of producing evidence of her intent, but it is not a factor influencing a determination of plaintiffs' belief.

We pass now to the evidence showing Mrs. Jensen's state of mind. In trying to piece together the bits of evidence so as to establish her intent, there are certain inferences which must of necessity be made. Undoubtedly, the trial judge in his analysis seized upon certain portions of the evidence as influential. We have not been favored with a memorandum decision by him showing how he arrived at his conclusion, so we must view the acts and conduct of the parties and draw the inferences that are most impressive to us. When the subject of sale was first suggested, neither the Sines nor Dowell knew the legal description of the parcel and so their conversations dealt with either the street numbers appearing on the duplex or the land adjacent to the motor court. There were no land marks on the ground or isolating feature to indicate to them that if the street numbers were used for identification purposes that the numbers would not fairly indicate to both vendor and vendee that the sale involved the full 75 feet. Without having been informed

or having made a search of an abstract or public records, no one but Mrs. Jensen would be familiar with the fact that she had purchased two separate pieces of property at separate times. She obtained the smaller piece in 1939, and so for at least eight years the county records, the physical set-up and the nature of the occupancy would suggest that the property was one parcel. When Dowell first approached Mrs. Jensen, he informed her of the purposes for which the property was to be purchased; namely, that it was being purchased by Mr. Sine, the contiguous property owner, to permit him to square out his holdings in that area and allow him to construct or erect a cafe or similar business on the site. There were no discussions at that time relative to metes and bounds, and no mention was made at any time that the discussions did not include the entire holdings of Mrs. Jensen. One of the important factors developed by Dowell in this conversation was that the property involved must be contiguous to the land owned by Sines. It is almost impossible to believe that after having been so informed, Mrs. Jensen would intend to deal only with a portion of the property without disclosing that fact. Likewise, it seems unlikely that when Mrs. Jensen was informed of the purpose of the purchase that she would intend to reserve a small strip of intervening land and by the retention destroy the principal purpose for which the property was being purchased. Dowell's opening conversation was not for the purchase of part of Mrs. Jensen's property on North Temple and there is no evidence that anyone ever discussed a frontage of 49.5 feet. If the nature and extent of the first conversation were such that had Mrs. Jensen intended to reserve the interior portion for herself, at some point in the conversation she would have notified Dowell. The substance of that conversation could not be construed as an offer to purchase or deal with a piece of property removed from the motor court and Mrs. Jensen's insistence on an increased price because of its increased value to Sine hardly comports

with an honest belief on her part that she was selling a piece of property cut off from that owned by the Sines.

In the second conversation between Dowell and Mrs. Jensen, the 75 foot dimension was discussed, the price was roughly computed on a footage basis, and the price compared to other property sold in that vicinity. There is no testimony that in that conversation Mrs. Jensen or Dowell mentioned the lesser footage of 49.5 feet, that computations were made on that basis, or that Dowell had any reason to suspect that Mrs. Jensen intended to hold out an interior portion of the property. It is unreasonable to conclude that Mrs. Jensen, who knew she owned 75 feet of property along North Temple and knew the property appeared to be in a single piece, would carry on all transactions and participate in the discussions prior to the signing of the real estate contract and never disclose to the buyer that she was selling less property than what appeared on the ground to be a single parcel.

Up to the point of executing the contract there does not appear to be any doubt about the intent of Mrs. Jensen. The written document was intended to express the oral understanding previously reached and it was when that was prepared that the 49.5 foot frontage first appears. The earnest money receipt identified the property as those premises located at 656-658 West North Temple, but the contract which included both the address and the legal description, showed the east-west course to be 49.5 feet. It is not difficult to understand how the misdescription in the uniform real estate contract arose. According to Dowell's testimony, the description was copied into the contract by a clerk in his office. The abstract had been delivered at that time and the distances and courses were obtained from the last entry in the abstract. The abstract was still in the possession of Mrs. Jensen at the time the earnest money receipt was signed so that the first opportunity to place the legal description in a

written document was when the real estate contract was prepared.

There are three additional bits of evidence which help tip the scales in favor of the trial court finding that Mrs. Jensen believed she was selling the full tract. There was a discussion between Mrs. Jensen and Dowell as to the value of the property and the amount Sines would be willing to pay. She apparently believed that a higher price could be exacted from them because of owning contiguous property, she knew that the price offered was slightly more than $100 per front foot, if the whole of the 75 feet were purchased, and this fact was called to her attention by Dowell. The amount offered on that basis seems consistent with the value of other property in that area and amounted to slightly more than the other sales. This price per foot is in keeping with the announced belief of Mrs. Jensen that Sine would pay more than any other purchaser. However, if Mrs. Jensen intended to sell the 49.5 foot strip for $8,500 she expected to obtain nearly $170 per foot, a price which far exceeded the reasonable value of the property and more than twice as much as that received for any other property in the neighborhood. The evidence indicates there were no improvements on the property or other reasons which would justify Mrs. Jensen in believing she could get such an inflated price for the property.

The second bit of interesting information illustrative of Mrs. Jensen's belief is given by her surviving husband. He testified that in a conversation with her in July, 1948, she suggested that he contact the Sines and try to get them to take the 25.5 foot piece. Mr. Jensen's approach to the Sines is very suggestive of an apprehension that all was not known He testified that he went to see Mrs. Sine at the auto court and prefaced his remarks with the following statement: "I asked her if she knew the 25.5 feet were not included in the purchase and of course she was quite surprised." This is a most unusual approach by an agent who

could only receive his instructions and information from his principal. His only source of information about the sale was from Mrs. Jensen and unless they had discussed the probability of a mistake, there would have been no reason for suspecting that the Sines would not know the 25.5 feet were not included. The timidity and the method of approach suggest knowledge of a misunderstanding.

Some seven months after the sale, Mrs. Jensen bequeathed the property involved to one of her daughters. At that time she described the property by the street address. She either believed the reference to the property by numbers adequately identified the full tract or she left the 25.5 foot piece unmentioned.

There is evidence in the record favorable to appellant's contention. The best evidence is the written documents. Aside from these writings there is the testimony that Mrs. Jensen, after the sale, made statements to the effect that she had retained a portion of the property for her own use. In addition, there is the evidence that she pointed out the property to one daughter and that in November, 1947, she paid the taxes on the smaller tract of property.

It is possible to reconcile some of this evidence with the evidence given in support of plaintiffs' claim. However, in certain instances the testimony of Mrs. Wheeler, the daughter, and Dowell is irreconcilable as their versions of the conversation were in dispute. The trial judge was in a position to observe their conduct, demeanor, frankness, apparent interest, or bias, and he apparently concluded to accept Dowell's version of the conversation. There is no evidence in the record which causes us to place the stamp of unreliability on Dowell's testimony and we know of no reason why the trial court could not reasonably conclude that his version was correct.

That evidence be clear and convincing does not require that it be undisputed in all details. It would be most un-

usual to have a trial on the merits where witnesses did not disagree on some of the circumstances, on parts of conversations, and on some of the facts. The test of clear and convincing is whether, taking the evidence as a whole, it preponderates to a convincing degree in favor of the plaintiffs. If it does, then it meets the test. In this case we conclude the evidence is sufficiently convincing to justify the trial court in finding a mutual mistake ■ of fact. As a matter of fact, any other finding would have rendered an absurd result, absurd in the sense that the reason for the contract known to both parties would have been utterly ignored.

The judgment of the lower court is affirmed, costs to respondents.

WADE and McDONOUGH, JJ., concur.

WOLFE, Justice (concurring specially).

I think the main opinion fairly well covers the province of this court in determining whether the fact finder should be sustained in his conclusion that the evidence has reached the degree of proof which the issue requires.

Perhaps it may contribute to point out that the rule of *Stanley* v. *Stanley*, 97 Utah 520, 94 P. 2d 465, applies to all degrees of proof. In that case the degree of proof required was one of fair or perhaps only mere preponderence. We said (in the concurring opinion) that if, after we read the record, it seemed to us that the evidence appeared to preponderate slightly *against* the conclusion of the fact finder, we would still affirm him because of the imponderables mentioned in the main opinion. Of course where the evidence was all documentary or of a nature as found in the case of *Greco* v. *Grako et al.*, 85 Utah 241, 39 P. 2d 318, 322, where the preponderance was so greatly "in favor of a conclusion different from that arrived at by the trial judge that the unrecorded parts of the trial could not

reasonably be expected to change such apparent preponderance, or where, * * * some fact independent of any element which might affect the credibility of witnesses speaks eloquently of a wrong conclusion by the trial judge, the rule does not apply." But otherwise, there is no reason why we should not if the degree of proof required is of the clear and convincing caliber uphold the findings of the trial judge as to his conclusion that the evidence reached that degree *even* if the evidence as we read it appears to us to fall slightly short of being clear and convincing. That is exactly the rule laid down in *Stanley* v. *Stanley, supra.* In both cases we thus give effect to the imponderables not revealed by the record.

In this way, we not only make allowance for the imponderables not revealed to us by the record but we also include some margin for the type of mind of the fact finder which is the margin which the "reasonable man" theory allows for differences in reasonable minds. Some minds are cautious, very conscientious, and come to their conclusions with great sense of responsibility and deliberation. But a slowly acting mind is not necessarly more accurate nor more sound than a fast one and quickness of mind noes not necesarily denote lack of consideration. Because there is a margin for different minds to react differently from the same evidence and even with the benefit of the imponderables, and still be within the area in which a mind may operate reasonably—that is with reason, we have in the past recognized the reasonable man test.

This is why in the case of *Greener* v. *Greener,* 116 Utah 571, 212 P. 2d 194, 206, where we also confronted clear and convincing evidence rule we said:

"We think that the evidence and the conclusions which could reasonably have been made therefrom were such to permit the mind of the trial judge to attain as a *reasonable man* to the state of being clearly convinced * * *" (Italics added.)

The thought that I am anxious to emphasize is that while

we take into consideration the advantaged position of the fact finder in that he views the live scene as against our reading the dead record, there must also be a factor allowed for differences we may expect in reasonable minds. We cannot set up our conclusions as being the only ones which reasonable minds could arrive at even had we had the advantage of the imponderables.

On the other hand the degree of proof which requires clear, unequivocal and convincing evidence in order to conclude for or against a certain issue is of importance and should be observed. It is used where one is charged with fraud because a party should not be stigmatized with fraud by a simple preponderance of evidence; in cases where it is necessary to set aside a release or a contract because of claimed fraud or mutual mistake of fact; in cases where reform of a contract is asked to comport with what is claimed to express the alleged real intent of the parties at the time the contract was made; in those cases where the courts are asked to do something which will change the situation from that which on the surface appears to be where the parties have placed themselves or where the situation should remain as it exists unless the court is morally convinced that justice requires that it be altered and in other cases where public policy requires that the status be not disturbed unless the proof goes beyond a mere or fair preponderance.

But there are degrees of proof between evidence which merely or barely preponderates and where it preponderates to a convincing degree just as there may be degrees between that evidence which convinces and that which proves a fact to a certainty. Evidence may be such as to create a definite probability that a conclusion is correct but not reach convincingness. It may have passed the point of equipoise and also the point of bare or mere preponderance and reached a point of definite probability, but may not have reached the point of conviction, I have taken occasion

to dwell at some length on these degrees of proof because there is an increasing tendency to ignore them and put all proof on a flat plane of mere preponderance. And this sort of result may be accomplished by the legerdemain of telling ourselves as reviewers that if it is convincing to the trial judge regardless of how it appears to us, we should accept it as convincing to us. I do not go that far. I think such reasoning is definitely on the side of retrogression.

While it may entail some repetition of evidence considered in the main opinion, I think I can best illustrate the application of the principles above mentioned by applying them to myself as a reviewer. We find several outstanding pieces of evidence which tend to establish the fact not only that the Sines intended to buy the 75′ but that Mrs. Jensen must have known that they so intended. I now first consider how the evidence as we read it from the record could have affected and influenced the mind of the fact finder (the lower court in this case) whom we assume is a reasonable mind trained for evaluating evidence so as to reach the stage of conviction. Second, I shall then compare the results of this analysis with the result when I consider the evidence from my own examination of the record assuming that I also have a reasonable mind trained to evaluate evidence. The trial court may have concluded that the evidence in favor of the plaintiff so definitely overcame the probative effect of the evidence in favor of the defendants and clinched the conclusion of mutual mistake that the evidence of such mistake was to the trial court clear and convincing. I refer to the following: Mrs. Jensen had treated the property as one and not two pieces. She knew that Sine wanted to buy the property to square off his holding to the east and north; that this was inconsistent with his purchasing a part of the whole frontage and leaving 25½′ of it in between.

She knew the price offered was more than $100 a front foot if the whole 75′ were purchased. This would yield a

good price for the whole. If she wanted $8500 for the 49.5′, she wanted nearly $170 per front foot, seemingly far more than the property was worth, and more than twice as much as any other property in the neighborhood sold for, at least according to the evidence.

If the idea of being convinced means that all reasonable doubt has left the fact finder's mind—which I think must attend the convinced state—I am not prepared to say that judging from the transcript, that mine would have been in that state. I conclude that judging from the record alone that I would have thought there was more than a simple preponderance that is a fair probability of a mutual mistake of fact, but not a convincing preponderance. However, the trial judge who saw and heard the witness may, as a reasonable man, have been convinced of the existence of a mutual mistake.

I am going into these different states of mind to show why I, on the face of this record would not have been convinced. I would still have what I think would be a reasonable doubt because the evidence itself was subject to substantial contradictory inferences. But I realize that I am not the fact finder but only a weigher of the evidence in cold print which was adduced before the fact finder in live form and that the fact finder, as says the main opinion, had the imponderables before him which may have supplied the clinching element. Even though in reading the record I would not have found it clear and convincing as I interpret that phrase, I cannot say that, taking into consideration the imponderables the trial judge did not operate on the evidence as a reasonable man and that as such he could not have come to the conclusion that the mutual mistake of fact appeared to him to be clear and convincing. Certainly it was not so far short of being free from reasonable doubt to me from a consideration of the record as to enable me to say that I would not have been convinced as was the trial judge if I had seen and heard the witness.

PRATT, Chief Justice (dissenting).

The reformation which was directed, changed the front and rear of the property covered by the contract from 49½ feet wide to 75 feet wide. The description of the property before reformation is as follows: "Commencing at the Southwest corner of Lot 3, Block 61, Plat 'C', Salt Lake City Survey, and running thence East 49½ feet; thence North 115 feet; to an alley; thence West along the South side of said Alley 49½ feet; thence South 115 feet to the place of beginning."

This small plat will ilustrate the relative positions of the strips in controversy:

An earnest money receipt involved in the case describes the property as "656—658 West North Temple" in Salt Lake City. These numbers are found on a duplex that sits upon the 49½ foot strip. The real estate contract also refers to the property by those numbers but includes the words "more particularly described as follows," and this is followed by the description quoted above. Furthermore, in an effort to clear the title as to names in the abstract, Catherine Jensen signed an affidavit reciting the above 49½ foot description.

Defendant claims there was no mistake, and claims that title came to deceased in two separate tracts; one, the 49½ foot strip in 1930 from a Catherine Hardy, the other, the 25½ foot strip, in 1939 from a Pehr J. S. Van Ehrenheim— and that Cathrine Jensen in agreeing to sell to plaintiffs was dealing with the 49½ foot strip only. Each of two

abstracts introduced in evidence show that until 1912 the two strips of property were carried as one strip 75 foot frontage and 115 feet in depth. In 1912 this Mr. Ehrenheim who then owned both strips, under a unit description of 75 foot frontage, conveyed 49½ feet away. Thereafter the strips were carried through various transfers as two separate strips of 49½ and 25½ feet respectively.

The 25½ foot strip lies between the 49½ foot strip and property owned and operated by plaintiffs as an auto court; and, is the property immediately adjacent to that court on the west.

Let me first give a brief history of the transactions of the parties without regard to the merit of the case. As I read that history, it is this:

A Mr. Dowell, a real estate agent, while visiting Mr. Sine on other business was informed by him that they, the Sines, were interested in buying the property west of their motor court (auto court on the plat above)—Dowell expressed it this way: That Sine said "next to my property"— so that he, Sine, could square his property off. Dowell, acting, as he told Mrs. Jensen, on behalf of Mr. Sine, contacted Mrs. Jensen about the property to see if she wished to sell it. He testified to having asked Mrs. Jensen this: "I understand you own some property on West North Temple adjoining the Bishop's Auto Court?" She said, "That is right." I said, "is it for sale?" She said, "Yes, I'll sell it." I said, "What would you ask for it? What would you take including the commission?" She said, "I want $8,500." I said, "I can't get $8,500. I can get you $8,000. I am authorized to buy it for $8,000." She said, "Who wants to buy it?" At this conversation, according to Mrs. Wheeler, a daughter of Mrs. Jensen, who incidentally was not mentioned in her will, Dowell referred to the property as 656 and 658 on West North Temple. These numbers, as stated above, are the numbers of the duplex on the 49½ foot strip.

After conversations with Mr. Sine and with Mrs. Jensen, Dowell prepared the earnest money receipt referring to the property by those numbers. He also had the uniform real estate contract and later the affidavit to clear names prepared, each of which describes the 49½ foot strip. This description was taken from the abstract covering that piece. The Sines signed the receipt and the contract before Mrs. Jensen did. The affidavit was signed by Mrs. Jensen after counsel for the Sines expressed some doubt as to the names. This was after the contract was signed. As evidence of Mrs. Jensen's state of mind as to property sold, testimony was introduced that she spoke to her daughters of having retained the 25½ feet; that she suggested a hot dog stand be placed upon it; and that she suggested to her husband that he try and sell it to the Sines. It was when he broached to the Sines the question of buying it that they claimed to have learned that it was not included in the contract. There was no obvious division line between the 49½ foot strip and the 25½ strip. It might be reasoned that the hedge in front of the 49½ foot strip, the roots of which ended approximately one foot and a tenth east of the dividing line, and the branches a few inches east of that line, and a sewer cleanout on the 25½ foot strip about 1.3 feet east of the line, indicate a division line. The 25½ foot strip was used for parking purposes by the tenants of the duplex. There were, at times, rubbish and old auto parts on that strip. There was a clothes line extending over it and an old shed upon it for a time. Some of these facts however are in controversy; particularly those as to the shed and clothes line.

After the Sines took over, they cleaned up the premises, including the 25½ foot strip and collected the rents from the duplex. The 25½ foot strip was again used for parking purposes. Mrs. Jensen lived in another part of the City, quite some distance from the property in question. She paid the taxes on the 25½ foot strip after the contract was

entered into. The contract called for the buyer to pay the taxes on the property purchased.

When the transaction was about ready for consummation, the abstract covering the 49½ foot strip was submitted to counsel for the Sines for their opinion as to the merit of the title; and they rendered a favorable opinion. It was their opinion that led to the affidavit identifying names, signed by Mrs. Jensen. It does not appear, however, that anyone dealing with the property for the Sines gave any conscious thought to the question of the width of the front of the lot being purchased. Throughout the entire transaction the Sines never had any personal contact with Mrs. Jensen. The real estate agent while on the witness stand admitted that he was at fault. The Sines signed the instruments without examining them with any degree of thoroughness.

The death of Mrs. Jensen is a considerable handicap in this case, as we do not have her version of the affair. The serious question in the case is that of whether or not Mrs. Jensen was laboring under any mistake of fact, when she contracted with the Sines. The burden rests upon the shoulders of the plaintiffs Sine to prove that she was. From the matters of fact I have recited above, I cannot escape the conclusion that they will support a finding that the Sines believed that the papers tendered them for signatures covered what they intended to buy—the 75 feet; but whether or not Mrs. Jensen was laboring under a similar error as to the property she was selling, is in grave doubt, especially in view of the fact that she had acquired the 75 feet as two lots of 49½ and 25½ feet respectively; and in view of the fact, also, that the proposition of purchase was put to her in the form of an offer as to the duplex house numbers, both orally, if Mrs. Wheeler is to be believed; and in writing as in the earnest money receipt made out by the agent for the Sines; and the real estate contract, also made out by the agent for the Sines. Mrs. Jensen's affidavit

clearly limits itself to the 49½ foot strip as she did not acquire the other strip from Catherine Hardy, mentioned in the affidavit as one of her immediate grantors.

In *Nordfors* v. *Knight et ux*, 90 Utah 114, 60 P. 2d 1115, at page 1116, this court discusses the rule applicable to reformation, and at page 116 quotes from the case of *George* v. *Fritsch Loan & Trust Co.*, 69 Utah 460, 256 P. 400, 403, as follows [I have taken the liberty of correcting a typographical error in the Utah Reports by inserting the italicized word "of" for "to" in the quotation.] :

"The law is well settled in this and in other jurisdictions that a written contract will be reformed to express the agreement of the parties where the proof of the mistake is clear, definite, and convincing, and where the party seeking the reformation is not guilty *of negligence* in the execution of the contract nor of laches in making timely application for its reformation."

Can it be said that the evidence we have recited in this case is clear, definite, and convincing of the fact that the minds of the parties met upon the inclusion of the 25½ foot strip as part of the contract? What about the carelessnessness or negligence of the Sines' agent? To answer the first question in the affirmative, one must surmount certain obstacles that have considerable weight. One of these is the fact that the moving parties in this controversy, the plaintiffs, are the ones who, through their agent, initiated the errors of which they now complain. Had they been the victims of a mistake made by the Jensen side of the controversy through an agent of the latter, the plaintiffs would have been standing upon more solid ground. We have here a peculiar situation of an agent of the complaining party preparing the instruments in which the error could have been ascertained and corrected by a bit of careful examination of the papers involved. Another point is that the instruments conform very definitely to the claims of the defendant. Viewing the earnest money receipt and the uniform real estate contract together, it is almost as if the agent has placed the vendor in the position of saying:

This sale covers only 656—658 West North Temple, "more particularly" described as follows—then the metes and bounds description. Having produced such a meticulous limitation in the contract and also in the affidavit, is it not incumbent upon plaintiffs to present very strong proof that Mrs. Jensen, by her actions or her words, indicated that she knew that the metes and bounds description included in the contract was a mistaken description? Of course, what is clear and convincing to one may not have a similar appeal to another; but the area of justifiable differences of opinion should have some relationship to the meticulous care exercised by the careless party in his efforts to particularize in the descriptions. Here the complaining parties are very willing to confess carelessness leading to error. It is, of course, to their interest to do so; and in fairness to them, it can be said that the testimony will support a finding of carelessness and error on their part. But what of Mrs. Jensen? Did she know all the time they were leading themselves astray? Did she shrewdly encourage them along the wrong road? There is not a great deal to found any such conclusion upon. The contract price was $8,500. For 75 feet frontage this would be approximately $113 per front foot. For 49½ foot frontage it would be approximately $171 per front foot. This may have some probative value in view of the fact that according to the testimony property in that vicinity had been sold for $85 per foot at an earlier time. The agent valued the property at $50 to $75 per front foot as vacant property. He thought a purchaser would tear the building down—it would probably be worth about $2,000. However no great amount of evidence was introduced on this subject of market values as of the time of the transaction.

Another fact is this: One might wonder why the Sines would want a strip of land owned by another splitting their holdings; and, in view of the prior use of the 25½ foot strip as a parking place, it would be reasonable to believe that

the Sines wanted it for that purpose. They so used it after the purchase. There are, of course, the expressions stated by the agent as used by him in broaching the subject to Mrs. Jensen. But they are met to considerable extent by the testimony of Mrs. Wheeler, a daughter of Mrs. Jensen, as to the agent's conversation which conforms very closely with what the agent did in making out the various papers. If the agent so conducted his conversations that the daughter thought he was talking only of 656-658 West North Temple, it is not unlikely that his statements appealed to Mrs. Jensen in a similar light. There is, of course, the question of the truthfulness of the witnesses involved, which question is much easier for the trial court to determine, than for us. *However, the bad feature of the case, so far as the plaintiffs are concerned, lies in the fact that everything their agent did had a tendency to impress upon the mind of one in the position of vendor, as was the deceased, the belief that is now claimed on her behalf to have been hers—the belief that the parties were dealing only with the 49½ foot strip.* To hold that Mrs. Jensen really knew that they wanted all the 75 feet, in spite of the particularity of the agent's descriptions to the contrary, is an assumption of moral turpitude on her part which hardly seems justifiable. She knew she had two pieces of property separately described. She gave the abstract of the one covered by the description of the contract and the affidavit. Can it be said with any degree of justifiableness that she deliberately withheld the other to lead them further along the path of error? The one abstract was sufficient for a careful person to catch the error. That abstract carries the property with its original 75 foot frontage and then shows the transfer of the 49½ foot strip. The plat of the abstract discloses a 75 foot strip. If she delivered the abstract with the hope that the error would not be discovered, she must have been gambling upon the agent's carelessness in checking through that abstract. I do not

believe that the proof is such that it can be reasonably said she was acting under mistake of fact; or that she knew the error existed and allowed the mistake to pass. Certainly it is not clear and convincing, nor definite.

I do not agree with some of the other statements in the prevailing opinion; but in the interest of brevity, I shall limit dissent to the discussion above, which I think is the most important point in the case. The judgment of the lower court should be reversed.