**Thomas T. THOMPSON and Lula Thompson, his wife, Plaintiffs and Respondents,**

v.

**Q. Keith SMITH and Rosslyn Smith, his wife, Defendants and Appellants.**

**No. 16662.**

Supreme Court of Utah.

Nov. 14, 1980.

Jim R. Scarth, David Nuffer of Snow & Nuffer, St. George, for defendants and appellants.

Phillip L. Foremaster, St. George, for plaintiffs and respondents.

HALL, Justice:

The defendants appeal the judgment of the district court which reforms a real estate contract.

In December, 1976, the plaintiffs, as sellers, entered into a contract with defendants, as buyers, for the sale of a cafe, store and motel located in Virgin, Utah. The purchase price of $51,000 was to be paid by a $22,000 down payment and monthly payments of $200 thereafter, to accrue at the rate of 8 percent per annum on the contract balance. However, defendants apparently were unable to make the down payment and hence sought and obtained the agreement of plaintiffs to reduce the down payment to $10,000. Thereafter, in early March, 1977, the parties met with one Allen Carter, of Southern Utah Title Company, in St. George, Utah, and enlisted his assistance in drafting a modification of the payment terms of their contract. Carter agreed to do so, but advised them that the reduction in the amount of the down payment would considerably extend the time for the final payment of the contract price. Sometime later, defendants unilaterally contacted Carter and advised him to redraft the contract to provide for a down payment of $6,500 and interest on the contract balance at 8 percent per annum through the first year only, with no interest thereafter. Defendants represented to Carter that plaintiffs had agreed to the new changes. Carter thereafter drafted the contract which is in controversy and which provides, in pertinent part, as follows:

3. Said Buyer hereby agrees to enter into and pay for said described premises the sum of Fifty-one Thousand and no/100th Dollars ($51,000.00) payable at the office of Seller, his assigns or order of

Zions First Nat'l Bank as Escrow Agent strictly within the following times, to—wit: Six Thousand Five Hundred Dollars_____ ($6,500.00) cash, the receipt of which is hereby acknowledged, and the balance of $44,500.00 shall be paid as follows:

The sum of $16,175.81 is hereby acknowledged through the Buyers assumption of the contract now in full force and effect with Odessa Severson, leaving a remaining equity balance of $28,324.19 due to Thompson which shall be paid as follows: One Hundred Fifty–two (152) Payments of $200.00 each with the last (153rd) payment being $190.13, which shall entirely discharge said Thompson equity obligation, including the interest built in to said payments aforementioned at 8% as computed for one year only on the $28,324.19 due to Thompson, which leaves an annual percentage rate of interest being charged at 0.62745% per annum should this contract go its full 12¾ years. If Prepayment is made it WILL NOT reduce the total of $28,324.19 plus $2,265.94 interest which is due in this contract FIRST PAYMENT DUE MAY 15, 1977, to Buyer on the 29th day of March, 1977.

4. Said monthly payments are to be applied first to the payment of interest and second to the reduction of the principal.

On March 29, 1977, the parties met at Zions First National Bank in Hurricane, Utah, to execute the agreement.[1] Portions of the contract were read aloud by the bank officer. A heated discussion followed with respect to the down payment which had been reduced in the contract to $6,500. Plaintiffs eventually conceded the reduction of the down payment but questioned the interest rate. The bank officer telephoned Carter for an explanation of the provision, but was unable to reach him. Ultimately, the parties signed the agreement as drafted by Carter. Approximately two days thereafter, plaintiffs became concerned over the interest provision and asked Carter to draft

yet another contract which would explicitly provide for an interest rate of 8 percent per annum. When defendants were presented with this new contract, they refused to sign and this suit for reformation was filed.

At trial, the parties testified, as did Carter and the bank officer. After hearing the testimony, the trial court entered its findings, which included the following:

That the agreement entered into by and between the parties on March 29, 1977 did not contain the agreement between the parties as it pertained to the payment of interest, and the parties had previously had a meeting of minds on the payment on interest in the amount of 8 percent per annum simple interest.

That the actual meeting of the minds between the parties was to the effect that interest would be paid on the outstanding balance of said contract at the rate of 8 percent per annum simple interest from the date of execution of the same until the outstanding principal balance plus interest was paid in full, and that each payment would be applied first to the payment of accrued interest and second to the reduction of principal.

Unfair advantage has been gained by the Defendants' Smith through the execution of the agreement between the parties as of March 29, 1977 and said agreement does not embody the actual agreement between the parties with respect to interest payments which should reflect 8% interest per annum on the unpaid balance during the life of the agreement rather than 8% per annum for one (1) year only.

Thereafter, the court entered its judgment ordering the contract of March 29, 1977, to be reformed to provide for the payment of interest at the rate of 8 percent per annum, simple interest, on the contract balance until both principal and interest have been paid in full. Defendants contend that plaintiffs knew the nature of the document they signed, and that because they

---

1. The bank was to act as escrow agent.

signed freely and voluntarily they should not now be allowed to avoid their agreement. Specifically, their points on appeal are: 1) The decree for reformation was contrary to law, being based upon a finding of "no meeting of the minds"; 2) there was no evidence to support finding mutual mistake or unilateral mistake and fraud; and 3) plaintiffs were guilty of inexcusable negligence.

■ Defendants are correct in their assertion that reformation is an improper remedy where there has been no meeting of the minds (and hence no contract).[2] However, in the instant case, there was a pre-existing agreement which the trial court found to express the real agreement or intention of the parties. If it can be shown that the difference in the two agreements was due to fraud or mistake as explained *infra*, then the agreement should be reformed.

■ The remedy of reformation is one in equity.[3] The general law is correctly stated by defendants as follows:

There are two basic grounds for the reformation of written instruments which do not correctly state and embody the intention and pre-existing agreement of the parties to the instrument, namely, (1) mutual mistake of the parties and (2) ignorance or mistake of the complaining party coupled with or induced by the fraud or inequitable conduct of the other remaining parties.[4]

It is clear that the first ground (mutual mistake) does not apply in the instant case. Our focus is therefore directed to the second ground—that of unilateral ignorance

(or mistake) by one party coupled with the inequitable conduct of the other party.

There is substantial evidence that plaintiffs did not understand the interest rate provision in the contract of March 29, 1977. When defendants sought to modify the original December contract, the single subject of negotiation was the down payment. Defendants experienced difficulty in selling their home for its full value, the proceeds of which were to be used as the down payment. Plaintiffs testified that they consented to reduce the originally agreed upon down payment from $22,000 to $15,000 and finally to $10,000. It is understandable that plaintiffs' basic attention was directed to the provision relating to down payment. Even defendants concede that plaintiffs may not have understood the interest rate provision. They contend, however, that there is an absence of evidence to show fraud or inequitable conduct on their part which would justify reformation.

■ After an agreement had already been reached (and presumably in realization of the implications of the long duration of the agreement), defendant unilaterally contacted the scrivener (Carter) and advised him to change the down payment to $6,500 and the interest rate to 8 percent for the first year only. He misrepresented that plaintiffs had agreed to such change.[5] We deem such behavior to constitute "fraud or inequitable conduct" on the part of defendants.

If the complaining party did not know of the mistake by the scrivener but the other party did know or deliberately procured the incorrect statement of the parties' agreement, then the ground for reformation is the mistake of one party cou-

2. If there has been any misunderstanding between the parties, or a misapprehension by one or both, so that their minds have not met, no contract has been entered into, and the court will not make for them a contract which they did not make. 66 Am.Jur.2d, Reformation of Instruments, § 14.

3. See *Jacobson v. Jacobson*, Utah, 557 P.2d 156 (1976).

4. 66 Am.Jur.2d, Reformation of Instruments, § 12. See also, *Rasmussen v. Olsen*, Utah, 583 P.2d 50 (1978).

5. At trial, Carter testified that he called plaintiffs to be sure that they were aware of the changes and plaintiffs testified of having no recollection of such communication. Whether the interest rate provision was changed with plaintiffs' knowledge therefore becomes a question for the fact finder.

pled with the fraud or inequitable conduct of the other.[6]

The trial court specifically found that defendants had taken unfair advantage of plaintiffs,[7] which finding warrants reformation on the facts presented.

The foregoing is consistent with the case of *McMahon v. Tanner*,[8] which holds as follows:

> [W]here, unknown to one of the parties, an instrument contains a mistake rendering it at variance with the prior understanding and agreement of the parties, and the other party learns of this mistake at the time of the execution of the instrument and later seeks to take advantage of it, equity will reform the instrument so as to make it conform to the prior understanding.

Finally, plaintiffs were not guilty of inexcusable neglect. The case of *Peterson v. Eldredge*[9] holds that a written contract will be reformed to express the agreement of the parties where the proof of mistake is clear, definite, and convincing, where he who seeks reformation is not guilty of inexcusable negligence in executing the same, and makes timely application for the relief sought. In the instant case, plaintiffs requested clarification of the interest provision of the contract at the time it was executed, and were unable to contact the scrivener to obtain clarification. Shortly after the discovery of the apparent meaning of the contract, plaintiffs immediately had a new contract prepared and requested defendants to execute it. Upon refusal of defendants to execute the new contract, plaintiffs immediately contacted an attorney and filed this action for reformation.

The judgment of the trial court is hereby affirmed. Costs to plaintiffs.

CROCKETT, C. J., WILKINS and STEWART, JJ., and R. L. TUCKETT, Retired, J., concur.

MAUGHAN, J., does not participate herein.

---

6. 66 Am.Jur.2d, Reformation of Instruments, § 21.

7. The court also found that during all of the times herein provided, the plaintiffs were elderly persons, 65 years of age or older, and appearing somewhat physically infirm and emotionally unstable, and had a difficult time in negotiating the terms and conditions of their transaction with the defendant Q. Keith Smith who appeared to be a more articulate, emotionally and physically stronger person of an aggressive nature.

8. 122 Utah 333, 249 P.2d 502 (1953), quoting *Spirt v. Albert*, 109 Conn. 292, 146 A. 717 (1929).

9. 122 Utah 96, 246 P.2d 886 (1952). See also, *Sine v. Harper*, 118 Utah 415, 222 P.2d 571 (1950).